1  CATHERINE A. CONWAY (SBN 98366)
   GREGORY W. KNOPP (SBN 237615)
2  STEPHANIE S. DER (SBN 240576)
   **AKIN GUMP STRAUSS HAUER & FELD LLP**
3  2029 Century Park East, Suite 2400
   Los Angeles, California 90067-3012
4  Telephone:      310-229-1000
   Facsimile:      310-229-1001
5  cconway@akingump.com
   gknopp@akingump.com
6  sder@akingump.com

7  Attorneys for Defendant, ERNST & YOUNG LLP

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11

12 | DAVID HO, on behalf of himself and others | Case No. CV 05-04867 JF
   | similarly situated and on behalf of the
13 | general public and DOES 1-20 | [Assigned for all purposes to the Honorable
   |                              | Jeremy Fogel]
14 |             Plaintiff,
   |                              | **DEFENDANT ERNST & YOUNG LLP'S**
15 |        v.                    | **MEMORANDUM OF POINTS AND**
   |                              | **AUTHORITIES IN SUPPORT OF**
16 | ERNST & YOUNG LLP            | **SUMMARY JUDGMENT**
17 |             Defendant.       | *[NOTICE OF MOTION AND MOTION FOR*
   |                              | *SUMMARY JUDGMENT; DECLARATION*
18 |                              | *OF DARLA HODAPP; DECLARATION OF*
   |                              | *CATHERINE A. CONWAY FILED*
19 |                              | *CONCURRENTLY HEREWITH]*
20 |                              |
   |                              | Complaint Filed: September 27, 2005
21 |                              |
22 |                              | Hearing Date:  September 21, 2007
   |                              | Hearing Time:  9:00 a.m.
23 |                              | Dept. 3
24
25
26
27
28

---

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff David Ho, a law school graduate with specialized training in tax law, was hired by Ernst & Young LLP ("Ernst & Young") at an above entry-level position to review and analyze client data, identify and research tax issues arising from client situations, conduct legal research and analysis, respond to client questions, and develop client relationships. During the two years that he was employed by Ernst & Young, Ho was responsible for researching various legal doctrines, analyzing complex international tax issues, drafting lengthy client memos, and communicating problems and solutions to clients. Managers relied on the legal research skills and tax training that Ho had acquired in law school, and trusted Ho to manage projects, analyze information, and respond to client inquiries with minimal supervision. In recognition of his value to the firm, Ho received an annual salary that ranged from $75,000 to $80,000, as well as a $10,000 starting bonus.

In this lawsuit, Ho claims that he *actually* spent the majority of his time performing "secretarial, clerical, and data entry support work" (Class Action Complaint for Unpaid Overtime Wages ("Complaint"), ¶ 11), and is thus entitled to overtime compensation under California law. Ho's own deposition testimony proves otherwise. There he acknowledged, for example, that he was the "primary" contact for several clients, with whom he developed "sustained" relationships. (Deposition Transcript of David Ho dated October 9, 2006 ("Ho Tr."), Ex. 4 at 020 & 139:20-140:1, 142:1-19.)[1] He admitted that he "play[ed] an active role" in client conference calls, "ask[ing] the appropriate follow-up questions," and that he responded directly to client inquiries. (*Id.*, 147:9-17, 158:1-17, 161:8-162:7, 167:12-15 & Ex. 4 at 020-021, 023.) He described a memo that he wrote translating complex foreign tax issues into "simple English" so that the client, who was "not a tax expert," could understand them. (*Id.*, 149:7-25 & Ex. 4 at 121.) The undisputed evidence, in short, compels the conclusion that Ho, a well-qualified and well-compensated tax consultant, performed important tax

---

[1] Excerpts and exhibits from Ho's deposition that are cited in this brief are attached to Catherine A. Conway's concurrently filed Declaration ("Conway Decl.") as Exhibit A. Deposition exhibits were authenticated as follows: Exhibit 1 (EY000024) authenticated at Ho. Tr. 31:5-23; Exhibit 2 (EY000017) authenticated at Ho. Tr. 87:6-13; Exhibit 3 (EY000009-EY000011) authenticated at 87:21-88:4; Exhibit 4 (020-024) authenticated at 136:15-25; and Exhibit 6 (121-125) authenticated at 147:6-17.

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

services for Ernst & Young's clients that required special training, experience, and knowledge, and that involved the regular exercise of discretion and independent judgment.

To the extent that there is any evidence that Ho spent less than 50 percent of his time performing exempt work, his own substandard performance is to blame. Ho received extensive criticism from managers on account of his weak analytical and communication skills, his shoddy work product, and his habitual tardiness. In fact, by his own admission, Ho performed only about *half* the client work that Ernst & Young expected of him. (Ho Tr. 39:11-43:4). California law is clear that an employee cannot succeed on an exemption claim by failing to meet his employer's reasonable expectations. *See, e.g.*, *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802 (1999) ("[A]n employee who is supposed to be engaged in [exempt] activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption.").

Because Ho's theory that he was not exempt from California's overtime requirements fails as a matter of law – and because that theory is the premise on which *all* the causes of action in Ho's Complaint are based – summary judgment should be granted.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Ernst & Young's Decision To Hire Ho, A Law School Graduate With A Substantial Tax Law Background, As A Member Of Its Tax Practice Group

In July 2000, David Ho, a candidate with extensive legal and tax training, applied to Ernst & Young's Tax practice group.[2] (Ho Tr., Ex. 1.) Ho had completed a number of graduate-level tax courses while studying at the University of California, Hastings College of the Law ("Hastings Law School"), including Corporate and Partnership Tax, International Tax, Estate and Gift Tax, Estate

---

[2] The firm's California operations are divided into three primary practice groups: (1) Tax; (2) Transaction Advisory Services ("TAS"); and (3) Assurance and Advisory Business ("AABS"). The Tax practice group, in turn, is divided between Tax Minimization and Tax Operations. Tax Minimization contains three "sub-anchors": (1) International Tax ("ITS"), which advises clients in understanding and minimizing tax exposures related to business activities outside of the United States; (2) Federal Tax, which advises clients in understanding and minimizing income tax exposures which could be assessed by the federal government of the United States; and (3) State and Local Tax ("SALT"), which advises clients in understanding and minimizing tax exposures with respect to state and local tax obligations. Tax Operations focuses on reporting the results of business activities to the appropriate tax authority and many times involves the preparation of client tax returns. (Declaration of Daria Hodapp ("Hodapp Decl."), ¶¶ 2-3.)

Planning, and Federal Income Tax.  (*Id.*, 14:22-15:20 & Ex. 2.)  Ho had also worked for more than a year at PricewaterhouseCoopers ("PwC"), where he was trained to conduct audits.  (*Id.*, Ex. 1 & 21:15-17.)  As a member of PwC's international auditing practice, Ho had performed "the audit and consolidation for U.S., Dutch, and other multinational clients," "evaluat[ed] business/accounting systems for possible flaws by tracing the flow of goods received/delivered from start to finish," reviewed clients' value added tax ("VAT") statements and "verified that the numbers looked reasonable," and worked closely with high-ranking client staff at smaller international clients.  (*Id.*, 34:2-36:7 & Ex. 1.)

On account of his strong tax background and professional experience, Ernst & Young hired Ho as a staff 2, an above entry-level position, in the Tax practice's ITS sub-anchor at an annual salary of $75,000 and with a starting bonus of $10,000.[3]  (*Id.*, Ex. 3.)

### B.   Ernst & Young's Realistic Expectations Of Its Staff And Senior Tax Professionals

As a staff 2 in the ITS sub-anchor, Ho was expected to "[i]nterpret and apply theoretical knowledge to practical business problems at both domestic and international levels," "[r]esearch appropriate tax knowledge sources, including legislation," and "identify potential tax issues arising from client situations."  (Hodapp Decl., ¶ 5, Ex. A at EY000149 – EY000153.)  Ho was also expected to "[i]dentify anomalies, incongruities and inaccuracies in data," "[t]est the data and the underlying assumptions," "[a]nalyze the key issues, patterns, and trends to identify their implications," and "[g]rasp issues, research, reference, interpret and document with minimal supervision."  (*Id.* at EY000160.)  Ernst & Young relied upon Ho to "[a]nswer clients' questions and requests promptly and effectively" (*id.*) and to "take[] responsibility for meeting client needs." (Hodapp Decl., ¶ 7, Ex. C at 009.)  Generally speaking, he was expected to use his judgment to "make[] suggestions as to how work can be improved," "challenge[] the way things are done," and "experiment with new ideas."  (*Id.* at 013.)

---

[3] The client service professionals in Ernst & Young's practice groups are organized into the following positions, in ascending order: staff 1, staff 2, senior 1, senior 2, senior 3, manager, senior manager, and partner/principal. All staffs and seniors except those in the Tax Operations are considered exempt from California and federal overtime requirements.  (Hodapp Decl., ¶ 4.)

3

In October 2001, Ho was promoted to the position of senior 1, and his annual salary was raised to approximately $78,000; the following year, he became a senior 2, with an $80,400 annual salary. (Ho Tr. 152:4-17.)  In addition to the responsibilities he already had as a staff 2, as a senior Ho was expected to delegate assignments to staffs 1 and 2, "provid[e] guidance on completing" the delegated tasks, and "[r]eview calculations and work prepared by others."  (Hodapp Decl., ¶ 6, Ex. B at EY000165 and EY000177.)  Ernst & Young also relied upon Ho to "[c]onsistently reach fully supported and accurate conclusions and communicate these to clients" (*id.* at EY000165), "[d]raw[] on knowledge and experiences to complete assignments and respond to straightforward client inquiries," "identif[y] and extract[] key issues and risks from large amounts of information," and "[t]hink[] through issues/alternatives before presenting work products or ideas." (Hodapp Decl., ¶ 7, Ex. C at 008 and 010.)  Finally, Ho was expected to "develop[] relationships and build[] a network of contacts," and "inspire[] confidence" in clients "by answering questions within [his] area of required skill and by demonstrating a professional demeanor."  (*Id.* at 009.)

When Ho joined Ernst & Young, he had a clear understanding of what was required of him. Specifically, he understood that client service and development were important components of the job (Ho Tr. 37:1-8), that the position required his "analytical and research skills" (*id.*, 36:18-25), and that he was expected to perform legal and tax analysis (*id.*, 94:9-25).  In fact, Ho took efforts to improve his tax credentials while working at Ernst & Young by enrolling in a number of Continuing Professional Education classes in various specialized tax subjects (*id.*, 45:24-48:19 (describing web-based training in foreign tax credit, withholding taxes, subpart F)), and by staying abreast of developments in the law (*id.*, Ex. 6 at 123).

**C.  Ho's Performance Of Tasks Important To The Provision Of Tax Services To Ernst & Young's Clients**

**1.  Ho's description of his own work**

At his deposition and in the self-assessments that he wrote and signed while employed by Ernst & Young, Ho described in great detail the substantive tax consulting work that he performed.  For example:

- Ho spent two to four weeks researching, reviewing and analyzing cases for a major firm client concerning the "informal claims doctrine," which permits a refund without filing a formal tax

4

return, and then wrote a 40 to 60 page summary of the cases he found.  (Ho Tr. 209:9-212:6.)
As Ho described in his self-assessment, "I relied on my legal research and reasoning skills to
find relevant case law, private letter rulings, field service memorandum, etc. and distinguish the
facts found therein from those of the client in question." (Hodapp Decl., ¶ 11, Ex. G at
EY000100.)

- Ho was asked by managers to review the Tax Code on a monthly basis, and also to analyze
  various tax issues.  (Ho Tr. 95:23-96:3, 103:18-105:6.)  For one assignment – not a "short" one
  – Ho reviewed "a 3-inch binder containing various joint-venture agreements . . . to look for
  potential foreign tax issues (such as permanent establishment, withholding taxes, indirect taxes,
  and structural planning considerations)," and "was able to write a high-level memo in about 6
  pages, citing illustrative examples in the agreements and keeping in mind that the target
  audience of the final work product is not a tax person." (Hodapp Decl., ¶ 11, Ex. G at
  EY000101; see also Ho Tr. 149:7-25 & Ex. 4 at 021.)

- Ho worked on "at least ten" "transfer pricing projects," which involved an "in-depth write up of
  the client's industry and line of products and services." (Ho. Tr., Ex. 4 at 021; id., 152:24-
  155:25, 73:12-74:23.)  In conducting the research necessary for each project, Ho reviewed and
  analyzed the information on the client's website to determine whether it was sufficient for the
  project's purpose.  (Id., 153:19-155:25.)

- Ho responded directly to certain client questions and relayed others to his managers.  (Ho Tr.
  145:24-146:24, 147:9-17 & Ex. 4 at 020.)  He "play[ed] an active role" in client conference
  calls and in one-on-one calls with clients, "ask[ing] the appropriate follow-up questions." (Id.,
  158:1-17, 161:8-162:7, 167:12-15 & Ex. 4 at 021 ("I have taken the opportunity to conduct
  conference calls on my own with clients and/or EY foreign desks/offices."); Ho Tr., Ex. 4 at
  023.)  On one occasion, Ho asked a question during a conference call that resulted in savings
  for the client by avoiding duplicate fees.  (Id., 162:8-163:21.)

- Ho developed "sustained" client relationships while working at Ernst & Young.  (Ho Tr. 142:1-
  19 & Ex. 4 at 020)  In his own words, he took "ownership of a few clients by being the primary
  ITS contact person with the client and various EY foreign offices and desks, and consulting the

manager and TSC as the need arises." (*Id.*)  Ho regularly contacted clients on his own to ensure that Ernst & Young was servicing their needs, with the goal of "strengthen[ing] the relationship between [the client] and EY." (Ho Tr. Ex. 4 at 020; *see also* Ho Tr. 142:1-144:19.)

- Ho gathered and reviewed client spreadsheets, which he recognized were a critical tool for determining whether the client "could lower its tax burden based on its foreign sales." (Ho Tr. 68:20-73:6.)  If the information that Ho received from the client was inaccurate, unclear or incomplete, he would make the necessary changes – or call the client to follow-up – "to ensure that the spreadsheet was uniform and consistent." (*Id.*)  Ho understood that the information he collected and revised was an important piece of the "overall solution" that allowed major clients to achieve significant tax savings. (*Id.*, 75:12-77:8.)

- Ho "developed a more efficient system than the one currently in use" for storing "many hundreds of client emails." (Ho Tr. 208:19-24.)  He also managed client deadlines, and juggled multiple client projects at once. (*Id.*, 208:25-209:5 & Ex. 4 at 022.)

- Finally, Ho testified that after an initial learning period, he was able to perform assigned tasks on a significant client project – including emails and calls with clients – without supervision. (Ho Tr. 177:8-178:12; *id.*, 67:17-68:5.)  As Ho wrote in one of his self-assessments:

> I have started to gain more working independently by taking ownership of some projects and assignments, thereby gaining more facetime with the client.  On various [client projects], I obtain information from foreign EY offices and conduct conference calls with the client and foreign EY offices without the presence of my manager.

(Hodapp Decl., ¶ 11, Ex. G at EY000100.)

Even after he left the firm, Ho continued to maintain that he was given considerable responsibility and substantive assignments while working at Ernst & Young.  In a May 17, 2005 letter seeking employment as an attorney, Ho wrote that at Ernst & Young he "learned to build persuasive cases and present [his] recommendations to internal and external clients in ways that would compel them to accept [his] ideas." (Conway Decl. ¶ 4, Ex. 3 at MPS-000003.)  His attached resume represented that he "[c]oordinated with EY's foreign desks, offices, and client tax departments to identify issues and possible solutions," and "[w]orked closely with managers and partners to create tax efficient strategies and solve tax controversies for multinational and startup clients." (*Id.* at MPS-

6

000004.)  Listing his accomplishments at Ernst & Young, Ho stated that he "[r]esearched tax procedural issues, such as jurisdictional issues of federal district courts and tax court, statutes of limitations, informal claims doctrine, and delegation order"; "[r]esearched and drafted technical memos and formal opinions on international tax issues"; and "[r]eviewed and analyzed various cost-sharing agreements and tax treaties for offshore transfer of intellectual properties." (*Id.*)  In his employment application form, he wrote that his "key duties" at Ernst & Young were "[r]esearch[ing] legal issues" and "[d]raft[ing] memos." (*Id.* at MPS-000007.)  A former Ernst & Young colleague whom Ho listed as a reference confirmed that he and Ho "did tax research" and wrote "memos on tax issues." (*Id.* at MPS-000013; *see also id.* at MPS-000012.)

## 2. Manager reviews

Ho's performance reviews confirm the high-level nature of the work that Ho performed, largely unsupervised.  One of the managers for whom Ho did the most work (Ho Tr. 67:17-68:5, 174:10-175:2) wrote that Ho "was responsible for tracking, collecting, and reviewing all client-provided documentation for inclusion into the final benefit calculation.  This required communicating directly with the client, managing due dates, [and] analyzing the data for consistency and sensibility . . ." (Ho Tr., Ex. 6 at 124.)  Ho was required "to become very familiar" with the client's business, "and with certain product lines in particular.  He was able to adapt his client calls/interviews to include information and examples pertinent to each distinct business area.  His write-ups were tailored to reflect these various businesses." (*Id.* at 121.)  The manager further noted that Ho "analyzed the completed information on his own," and that his "work products required very little conceptual re-work." (*Id.* at 122.)

Another manager, whom Ho "assisted . . . with a variety of engagements involving research, project management, and modeling" (Hodapp Decl., ¶ 11, Ex. G at EY000100), stated in his review that Ho "has started to build relationships with a few 'emerging market' clients," who "feel[] comfortable contacting [Ho] as an initial ITS resource" (*id.* at EY000108).  He also remarked that Ho brought a "solution[] to the table" by identifying "an expat opportunity" during a client conference call (*id.* at EY000115), and "did a great job managing a foreign liquidation project with little assistance from me or the TSC" (*id.* at EY000112).

Ho's reviews also made clear that his job entailed substantive tax research, not simply retrieving documents. Ho was asked to research "various issues around FSC legislative provisions," and his "responsibilities were to understand the issue, complete the research and document findings." (Hodapp Decl., ¶ 9, Ex. E at 109 and 111.) Managers praised Ho for "read[ing] tax periodicals" and "stay[ing] abreast of the latest changes to the tax laws." (Hodapp Decl., ¶ 11, Ex. G at EY000124.)

One manager described in her review the highly difficult management fee study to which Ho contributed. (Hodapp Decl., ¶ 10, Ex. F at 112.) As part of the project, Ho was required, among other things, to "[p]repare allocation and apportionment model in Excel" and "[d]raft allocation methodology and cost centers summaries." (*Id.* at 114.) Ho sought out "new responsibilities" during the "challenging" project, for example, he "asked to lead client's interviews." (*Id.*) Ho was granted the requested opportunity, but discovered during the interview that he did not have the "skill level" necessary to ask the client questions and to simultaneously record the most significant answers. (Ho Tr. 122:20-130:6.)

### D.     Ho's Failure To Meet Ernst & Young's Realistic Expectations

Although Ho did work of substantial importance, his performance was lacking in certain respects. One manager, for example, commented that Ho's inability to "communicate in a clear and concise manner" "prevent[ed] the project lead from allowing him to make calls without supervision." (Ho Tr., Ex. 6 at 121; *see also* Hodapp Decl., ¶ 11, Ex. G at EY000101 (Ho "should . . . continue to work on his oral communication skills – specifically, the ability to communicate complex tax issues in an organized and comprehensive manner."); *id.* at EY000136 ("David needs to continue working on his executive presence, so his presentation of the results is more confident and convincing.").)

Ho's analytical skills were also the subject of criticism. One manager for whom Ho conducted legal research stated in his performance evaluation that Ho "could have made a more concerted effort to be more analytical in his approach." (Hodapp Decl., ¶ 8, Ex. D at 120.) Another manager recognized that Ho "appeared to have difficulties matching the tax technical concepts of the project with the project tasks. For example, when making telephone calls to clients to identify marketing and engineer contacts for the royalty project, [Ho] struggled to understand and communicate the need for Ernst & Young to speak with these individuals." (Ho Tr., Ex. 6 at 122.) Managers advised in general

8

that Ho "should take more ownership in engagements," and "ask more questions in order to more fully understand the issues." (Hodapp Decl., ¶ 11, Ex. G at EY000101; *see also id.* at EY000110 ("[H]e should make an effort to ask more questions and more proactively seek to understand the 'higher level' purposes of our engagements.").) One manager stated, "I would like for him to think through issues on his own and provide more feedback during engagements, *rather than merely doing what is asked of him.*" (*Id.* at EY000114 (emphasis added); *see also id.* at EY000101 ("[Ho] should also try to do more than what is expected of him – he often does exactly what he is told rather than suggesting alternatives and adding his opinions.").)

Managers also observed that Ho's work product was sloppy, and that he needed "to do a better job of reviewing deliverables" before sending them to the manager or the client. (*Id.* at EY000113; *see also* Ho Tr., Ex. 6 at 122 (Ho "would benefit from an increased focus on details. For example, workpapers for project documentation need to be neat and legible as they may ultimately be given to the client or to the IRS.").) One manager complained in her performance evaluation:

> *David should pay more attention to details* and improve do better self-review. For example, the calculation model and cost center summaries provided for the review did not tie out. *David was not consistent in updating documentation* (e.g., aligning comments in Excel computation model and methodologies). David also misspelled client's name and when pointed to the error, corrected a single document but did not review/update all relevant documents to ensure that proper name is used. Occasionally, *David forgot to follow up on certain tasks* communicated to him by e-mail. For example, when legal expense details were received from the client, changes were neither made in the Excel model nor in allocation methodology. *I believe, quality is a true area of improvement for David.*

(Hodapp Decl., ¶ 10, Ex. F at 113 (emphasis added).) She summarized that the "*overall quality of documents produced by David was lower than expected from a Senior*. I believe David should work on improving the quality of his work via a thorough self-review, paying closer attention to detail, asking questions to ensure that he understands the assignment, timeframe, and deliverable." (*Id.* at 114 (emphasis added).)

In addition to the content and quality of his work, Ho's "atypical" work schedule drew criticism from managers. As one manager for whom Ho worked for three to four months described:

> *David maintained hours that hindered working a standard day, usually arriving 1 to 1 ½ hours after the rest of the R&D team.* Several of David's clients were

9

> located in time zones east of California, including some in Europe, and it was essential to begin the work day early in order to get in contact with these clients. Also, the need to provide supervision much of the time, in addition to leading three other team members, made it difficult to accommodate David's atypical schedule without putting in overtime above and beyond that already being worked by the project lead.

(Ho Tr., Ex. 6 at 124 (emphasis added); *id.*, 67:17-68:5, 174:10-175:2.) Ho admitted at his deposition that he was criticized for his habitual tardiness, and that he would arrive to work after 10 a.m. several times each week. (*Id.*, 50:14-52:8.) Ho also acknowledged that he "generally" took lunches that were "[a]bout an hour, one and a half" hours long (*id.*, 63:22-64:2), and that he "sometimes" left work early on Friday afternoons (*id.*, 222:8-10).

Ultimately, as Ho conceded at his deposition, the time that Ho spent billing to clients – his "client billable time" – was far below Ernst & Young's expectations. (Ho Tr. 39:11-41:19.) While Ernst & Young expected its professional employees to have a "utilization rate" between 70 and 80 percent, Ho's utilization rate was 36 percent his first year, and 40 percent his second. (*Id.*, 41:2-43:4.)

## E.   Ho's Termination From Ernst & Young And Subsequent Lawsuit

On December 12, 2002, Ho was terminated for failing to meet Ernst & Young's performance expectations. (Ho Tr. 10:11-12, 196:25-197:18.) On September 27, 2005, Ho filed this lawsuit against Ernst & Young, "demand[ing] overtime compensation as provided under California law." (Complaint, ¶ 16.) Ho alleges that the "great majority of [his] work . . . included, but was not limited to, secretarial, clerical, and data entry support work, including filing papers, organizing and assembling documents, taking notes of meetings, entering spreadsheet data and formatting spreadsheets, and similar tasks requiring little or no exercise of independent judgment or discretion." (*Id.*, ¶ 11.) That theory is the foundation for his claims under Labor Code section 1194 for unpaid overtime wages, Labor Code sections 218.6 and 203 for statutory interest and waiting penalties with respect to those unpaid wages, and California's Unfair Competition Law ("UCL") for the "unlawful business practice" of misclassifying Ho as an exempt employee. (*Id.*, ¶¶ 13-28.) Ho purports to represent a class of all Ernst & Young staff 1, senior 1, and senior 2 employees "who were performing the same sort of functions of the named plaintiff, and subject to the same salaried compensation system . . . who were not compensated for their work and overtime work as required by California law." (*Id.*, ¶ 6.)

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

## III.   STANDARD OF REVIEW

"Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Perine v. ABF Freight Systems, Inc.*, 457 F. Supp. 2d 1004, 1010 (C.D. Cal. 2006). "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact," which "may be met by 'showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 325 (1986)). "Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 323-24).

"'A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.'" *Perine*, 457 F. Supp. 2d at 1010 (quoting *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000)). "Only genuine disputes – where the evidence is such that a reasonable jury could return a verdict for the nonmoving party – over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## IV.   ARGUMENT

### A.   The Undisputed Evidence Establishes That Ho Was Administratively Exempt From California's Overtime Requirements.

An employee is considered administratively exempt under California law when he (1) performs "non-manual work directly related to management policies or general business operations of his employer or his/her employer's customers"; (2) "customarily and regularly exercises discretion and independent judgment"; (3) "work[s] along specialized or technical lines requiring special training, experience, or knowledge" under "only general supervision"; (4) "is primarily engaged in duties that meet the test of exemption;" and (5) "earn[s] a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." 8 Cal. Code Regs. § 10040(2).

11

Ho's own deposition testimony, coupled with his self-assessments and performance evaluations, establish that Ho meets all the criteria for the administrative exemption.  Any evidence that Ho spent less than 50 percent of his time performing exempt duties is attributable to Ho's own substandard performance, which is well-documented with "concrete expression of employer displeasure" and which cannot support an overtime exemption claim.  *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 802 (1999).  Where, as here, the undisputed evidence demonstrates that plaintiff was administratively exempt from overtime wage requirements, summary judgment is appropriate.  *See, e.g., Copas v. East Bay Municipal Utility District*, 61 F. Supp. 2d 1017, 1021-36, 1039-41 (N.D. Cal. 1999) (holding on summary judgment that certain municipal water utility employees, including public relations officers, community affairs representative, personnel department analyst, and occupational health and safety administrator, were administrative employees exempt from Fair Labor Standards Act ("FLSA") overtime requirements)[4]; *Freeman v. Corporate Express Delivery Systems*, No. C98-04873, 1999 WL 1012331, at *1 (N.D. Cal. Nov. 2, 1999) (holding on summary judgment that lead dispatcher at delivery facility was administrative employee exempt from overtime pay under the FLSA); *Perine*, 457 F. Supp. 2d at 1016 (holding on summary judgment that employee was administratively exempt from overtime requirements under California law); *Palacio v. Progressive Insurance Co.*, 244 F. Supp. 2d 1040, 1049 (C.D. Cal. 2002) (holding on summary judgment that insurance claims representative was administrative employee exempt from FLSA's overtime requirements).

### 1. Ho performed office work directly related to the general business operations of Ernst & Young and its clients.

The requirement that an administratively exempt employee perform work "directly related to management policies or general business operations of his employer or his employer's customers," 8 Cal. Code Regs. § 11040(2)(a)(I), refers to work "relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work," 29 C.F.R. §

---

[4] This Court is "explicitly permitted to refer to federal authorities for analytical support in interpreting [the] Wage Order." *Perine*, 457 F. Supp. 2d at 1011; *see also Nordquist v. McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555, 562 (1995) ("Because the California wage and hour laws are modeled to some extent on federal law, federal cases may provide persuasive guidance.").

DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT

541.205(a).[5] Although Ho suggests that he engaged in "production" rather than "administrative" work because he "assisted [his] superiors in the production of the products and services provided by the defendant's business to its customers" (Complaint, ¶ 11), courts have squarely held that business consultants or advisors who contribute to the production of reports for their employers' clients engage in "administrative," not "production," work. In *Grabowski v. Chandler Asset Management*, No. D039354, 2003 WL 1721450 (Cal. Ct. App. Mar. 27, 2003), for example, plaintiff – an investment advisor responsible for "taking the information from the portfolio accounting and management system and compiling it on a spreadsheet program," *id.* at *1 – claimed that he was a non-exempt production worker because the client reports that he created were his employer's product, *id.* at *4. The California Court of Appeal flatly rejected plaintiff's theory:

> Although these reports were included in the fee [the employer] charged its clients, they were not its product. Clients did not contract with [the employer] to produce accounting reports, but to manage their fixed income assets. Even if the reports were products, *the production of those reports is administrative work.*

*Id.* (emphasis added). The same argument was raised in *Picscione v. Ernst & Young, L.L.P.*, 171 F.3d 527 (7th Cir. 1999), by an Ernst & Young consultant who produced defined benefit and contribution retirement plan reports, but the Seventh Circuit summarily dismissed it:

> It is true that [the employee] supplied customers with reports and filed government forms that in themselves could be considered "products"; however, accepting that argument would mean that any consultant's or analyst's report would be a product. This result would directly contradict the manner in which the regulations classify these individuals.

*Id.* at 540; *see generally Bell v. Farmers Ins. Exchange,* 87 Cal. App. 4th 805, 826 (2001) ("We recognize that the administrative/production worker dichotomy is a somewhat gross distinction that may not be dispositive in many cases. . . . For example, some businesses, such as management consulting firms, may provide services that clearly pertain to business administration, even though they are activities that the businesses exist to produce and market.").

---

[5] California's Wage Order specifically incorporates the FLSA regulations construing "[t]he activities constituting exempt and non-exempt work" that were in effect on the date of the Order, January 1, 2001. 8 Cal. Code Regs. § 11040(f) (incorporating 29 C.F.R. §§ 541.201-205, 541.207-208, 541.210 and 541.215); *see also Bell v. Farmers Ins. Exchange,* 87 Cal. App. 4th 805, 820 (2001). As a result, all citations to the C.F.R. in this brief are to the regulations in effect when Wage Order 4-2001 was adopted, and are attached for this Court's convenience as Exhibit B to the Conway Declaration.

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

The pertinent federal regulations, in fact, specifically recognize that tax consultants and tax experts who furnish services to their employer's clients perform the type of work covered by the administrative exemption. 29 C.F.R. § 541.205(c)(1) ("[A] tax consultant employed by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business."); *id.*, subd. (d) ("[M]any bona fide administrative employees perform important functions as advisers and consultants . . . . Typical instances are tax experts . . . financial consultants . . . ."). Ho, a tax consultant with a substantial tax law background (Ho Tr. 14:22-15:20, 34:2-36:7 & Exs. 1, 2) who serviced the business operations of his employer's clients by helping to minimize their tax liability (*id.*, 75:8-14), clearly qualifies.[6]

Faced with strikingly similar facts, the *Piscione* court affirmed the district court's decision on summary judgment that plaintiff, "a careertrack employee" who had been employed as a staff and senior in Ernst & Young's Indianapolis office, had performed duties directly related to the business operations of Ernst & Young and its clients. Like Ho, the *Piscione* plaintiff claimed that as a consultant in Ernst & Young's defined benefits practice, "he spent the vast majority of his time applying company formulas, gathering and placing data in reports, taking numbers and placing them in the appropriate spots on government forms, and answering 'basic questions about the plan like eligibility for participation, eligibility for retirement, etc.'" 171 F.3d at 538. Relying on plaintiff's deposition testimony and self-assessments, the Seventh Circuit rejected plaintiff's characterization and held that plaintiff's "duties included tasks that influenced the business operations and policies of Ernst & Young's clients, as well as the business operations and policies of the firm itself":

> *His duties with regard to clients were substantial.* . . . According to his deposition testimony, *he wrote to clients indicating problems and suggesting solutions.* In addition, he made suggestions to clients regarding how they could improve their efficiency. *He also served as the primary contact for several clients* while working in the defined contribution plans practice group. He instructed clients to contact him with their questions.

*Id.* at 539 (emphasis added).

---

[6] Notably, Ho testified that one of his responsibilities was to write memos that could be understood by clients who were *not* tax experts. (Ho Tr. 149:7-150:6.) The necessary implication, of course, is that Ho *is* a tax expert.

Exactly like the plaintiff in *Piscione*, Ho testified at his deposition that he had "substantial" client responsibilities, and that he "served as the primary contact for several clients." (Ho Tr. 142:1-19, 145:24-146:24, 147:9-22, 158:1-17, 161:8-163:21, 167:12-15 & Ex. 4.)  In his self-assessment, Ho stated that he took the initiative to call clients "to answer any on-going questions," and that he "directly answer[ed] the client's query." (*Id.*, Ex. 4 at 020.)  In addition, Ho alerted clients to inaccuracies or omissions in spreadsheet data (*id.*, 68:20-73:6), and worked with clients "to identify issues and possible solutions" (Conway Decl., ¶ 4, Ex. 3 at MPS-000004).

Also like the *Piscione* plaintiff, Ho "developed methodologies to improve services and try to save time." 171 F.3d at 539.  As one of Ho's managers stated in her performance evaluation:

> *He looked for ways to improve existing processes.*  When storing the many hundreds of client emails, David developed a more efficient system than the one currently in use, saving several hours of time.

(Ho Tr., Ex. 6 at 122 (emphasis added).)[7]  Ho not only improved Ernst & Young's efficiency, but also improved its client services.  In his self-assessment, Ho described one instance in which he directly saved the client money:

> For the ongoing liquidation process of [the client], when I determined from my communications with [the client contact] that much of the work was already in progress with the client's local country's accountants/attorneys, I asked [the Tax Services Coordinator ("TSC")] to clarify with the client EY's (both domestic and foreign) role.  [The TSC] ascertained that EY's role was to oversee the liquidation process.  This prevented the unnecessary duplication of work.

(Ho Tr., Ex. 4 at 022; *see also id.*, 162:8-163:21.)  On another occasion, Ho "brought a solution to the table" by identifying "an expat opportunity" during a client conference call. (Hodapp Decl., ¶ 11, Ex. G at EY000115; *see also* Conway Decl., ¶ 4, Ex. 3 at MPS-000004 (Ho "[w]orked closely with managers and partners to create tax efficient strategies and solve tax controversies for multinational and startup clients.").)  Ho's duties, in sum, "clearly influenced the way in which [] clients interacted with Ernst & Young and potentially, their internal operations" as well. *Piscione*, 171 F.3d at 539.

---

[7] Ho conceded at his deposition that this statement in his evaluation is accurate. (Ho Tr. 208:19-24.)  This Court, moreover, has explicitly relied on performance evaluations in deciding on summary judgment whether an employee satisfies administrative exemption criteria. *Copas*, 61 F. Supp. 2d at 1027.

15

### 2.   Ho customarily and regularly exercised discretion and independent judgment.

"[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a).  Implicit in that requirement is the understanding that "the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.*  The requirement, however, "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." *Id.*, subd. (e).  Instead, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.*; *see also Copas*, 61 F. Supp. 2d at 1026.

In *Copas*, a municipal utility analyst claimed – like Ho – that "although he held the title and received the salary of Principal Management Analyst, he did not perform the duties of that position," and that his actual duties entailed "gathering the information that went into various memos to the Retirement Board under [his supervisor's] name." 61 F. Supp. 2d at 1033-34.  This Court, however, pointed to undisputed evidence that the analyst's "research was included" in various memos, and that the analyst had "assisted the [the utility]'s actuary in compiling the information required for the annual actuarial and valuation reports." *Id.* at 1034.  For one assigned project, the analyst had "sent an application for the low-income adjustment for any retiree who requested one, and reviewed those completed applications for eligibility under the rules. . . . [I]f the applicants didn't qualify, he communicated with them to explain the reasons." *Id.*

Granting summary judgment for the municipal utility, this Court held that the analyst had "exercised discretion and independent judgment in communicating with [the utility]'s retirees, in researching issues such as poverty levels, and in drafting memoranda to the Retirement Board." *Copas*, 61 F. Supp. 2d at 1036.  Evidence that the analyst had "compiled information and prepared an annual report pursuant to the terms of a settlement agreement" also confirmed that he had "exercised discretion and independent judgment with respect to matters of significance." *Id.*

1    Similarly, in *Piscione*, an Ernst & Young benefits consultant argued that he had not exercised

2    discretion and independent judgment because he had "prepared reports by merely plugging in numbers

3    into formulas," and because "[t]he time he spent with the clients involved asking basic plan questions,

4    not proposing solutions to problems he allegedly found while analyzing their data." 171 F.3d at 531.

5    The Seventh Circuit affirmed the district court's grant of summary judgment, citing deposition

6    testimony in which plaintiff "admitted to making improvements in the efficiency of Ernst & Young by

7    developing methodologies to improve client services and . . . . save time." *Id.* at 536.  The *Piscione*

8    court further noted that plaintiff's "duties advising and counseling clients" "necessitated" the exercise

9    of discretion and independent judgment:

10   > For example, *he testified that he had to communicate due dates* to his clients
     > based on his judgment as to how long it would take to finish the particular
11   > project.  His duties associated with conducting actuarial valuations and
     > compliance testing required him to *summarize problems in clients' accounts,*
12   > *inform clients about these problems, and suggest solutions. . . .* Moreover,
     > *[plaintiff] wrote to clients telling them that they should contact him* with their
13   > questions about their accounts. . . .  All of these duties involved choosing
     > between various possibilities and then making a decision to convey the ultimate
14   > choice to the client.

15   *Id.* at 537 (emphasis added); *see also Grabowski*, 2003 WL 1721450, at *4 (affirming trial

16   court's decision that employee who had "engaged in significant client communication, answering

17   client's accounting questions and preparing customized reports to meet client's needs," had exercised

18   discretion and independent judgment).

19   The case-law discussed above makes crystal clear that Ho exercised discretion and independent

20   judgment with respect to the "significant" matter of helping major firm clients "save on their tax

21   liability" (Ho Tr. 75:8-14).  Like the plaintiff in *Copas*, Ho researched various issues and drafted

22   memos discussing them (*id.*, 149:7-25; *id.*, 209:9-212:6; *id.*, 73:12-74:23 & Ex. 4 at 021; Hodapp Decl.

23   ¶ 9, Ex. E at 109-111; Conway Decl., ¶ 4, Ex. 3 at MPS-000004, MPS-000007, MPS-000012-MPS-

24   000013) – tasks that by their very nature involve significant amounts of discretion and independent

25   judgment.  Also like the *Copas* plaintiff, Ho was responsible for reviewing and analyzing information

26   "on his own," and identifying issues or problems contained therein.  (*See, e.g.*, Ho Tr., Ex. 6 at 122 (Ho

27   "always analyzed the completed information on his own and drew up a list of potential questions and

28

17

follow-up items prior to seeking the input of the project lead."); *id.* at 124 (Ho "was responsible for tracking, collecting, and reviewing all client-provided documentation for inclusion in the final benefit calculation. This required communicating directly with the client, managing due dates [and] analyzing the data for consistency and sensibility . . .").) Moreover, like the plaintiff in *Piscione*, Ho created efficiencies for Ernst & Young "by developing methodologies to improve client services" (*see infra*, pp. 15-16), and had comparable client contact, which included communicating due dates, informing clients about various tax or data issues, and responding to client inquiries (*see* Ho Tr. 145:24-146:24, 147:9-22 & Ex. 4; *id.*, 158:1-17, 161:8-163:21, 167:12-15; *id.*, 68:20-73:6; *id.*, Ex. 6 at 124; Hodapp Decl., ¶ 11, Ex. G at EY000115).

The record reveals numerous other instances in which Ho made significant, independent decisions after comparing and evaluating "possible courses of conduct," 29 C.F.R. § 541.207(a). Ho regularly decided which client questions to answer directly, and which questions to relay to his managers (Ho Tr. 145:24-146:24, 147:9-22 & Ex. 4 at 020), when and how to approach various client contacts in order to enhance the overall relationship (*id.*, Ex. 4 at 020; *id.*, 142:1-144:19), how to complete his assigned work while staying within the client's budget (*id.*, 168:22-169:24), how to translate complex tax concepts into "plain English" for clients who were not tax experts (*id.*, 149:7-150:6), and whether the information on the client's website was sufficient for purposes of completing an "in-depth write up of the client's industry and line of products and services" or whether further research was necessary (*id.*, 152:24-155:25 & Ex. 4 at 021). Also requiring the exercise of discretion and independent judgment, Ho managed client deadlines, juggled multiple client projects simultaneously (*id.*, 208:25-209:5 & Ex. 4 at 022; *see also* Hodapp Decl., ¶ 11, Ex. G at EY000125), and used his familiarity with clients' businesses "to adapt his client calls/interviews to include information and examples pertinent to each distinct business area" (Ho Tr., Ex. 6 at 121). Based on that undisputed evidence, there can be no genuine issue of material fact concerning whether Ho regularly exercised discretion and independent judgment while employed by Ernst & Young.

### 3.   Ho performed work along specialized or technical lines requiring special training, experience, or knowledge under only general supervision.

Ho also fits comfortably within the category of employees who "work[ed] along specialized or technical lines requiring special training, experience, or knowledge." 8 Cal. Code Regs. § 11040(A)(2)(d). Ho came to Ernst & Young with impressive tax credentials, having completed a number of graduate-level tax courses at Hastings Law School. (Ho Tr. 14:22-15:20 & Ex. 2.) He gained additional tax experience while working at PwC (*id.*, 34:2-36:7 & Ex. 1), and improved upon his knowledge by taking Continuing Professional Education classes in various specialized tax subjects (*id.*, 45:24-48:19) and by "stay[ing] abreast of the latest changes to the tax laws" (*id.*, Ex. 6 at 123).

Ho was "recognized within [his] department" as having "strong tax research skills" (Hodapp Decl., ¶ 11, Ex. G at EY000137 ("He is probably one of the strongest within his peer group from tax research standpoint.")), and a "strong legal background" (Ho Tr., Ex. 6 at 122 (noting that Ho is "well versed with the [Internal Revenue Code] and Treasury Regulations")), and was assigned to research tax law questions (*id.*, 209:9-212:6; Hodapp Decl., ¶ 11, Ex. G at EY000100-EY000101; Hodapp Decl., ¶ 9, Ex. E; Conway Decl., ¶ 4, Ex. 3 at MPS-000004, MPS-000007, MPS-000012-MPS-000013), to review the Tax Code (Ho Tr. 103:18-105:6), and to identify and analyze various tax issues (*id.*, 95:23-96:3, 149:7-150:6, 166:19-167:11 & Ex. 4 at 022; Hodapp Decl., ¶ 11, Ex. G at EY000101) – tasks that clearly require a background in tax law. Ho admittedly "relied on [his] legal research and reasoning skills" in performing his assignments (Hodapp Decl., ¶ 11, Ex. G at EY000100; *see also* Ho Tr. 158:18-161:5 (conceding that his tax law background "added some expertise" and assisted his performance of research and analysis)), and recognized that managers counted on his "legal research skills" in particular (*id.*, 166:19-167:11 & Ex. 4 at 023). Clearly, an employee without Ho's qualifications could not have performed the same role within ITS. *Ashworth v. E.B. Badger & Sons Co.*, 63 F. Supp. 710, 714 (D. Mass. 1945) (holding that plaintiff satisfies the "specialized work" requirement if "one without special training or experience along the lines of the work performed here could not perform the work with any satisfactory degree of accuracy").

With respect to the requirement that the specialized work be performed "under only general supervision," 8 Cal. Code Regs. § 11040(A)(2)(d), the evidence is undisputed that Ho qualifies. Ho

19

himself testified that after an initial learning period, he was able to perform certain assigned tasks – including client calls and emails – without supervision.  (Ho Tr. 177:8-178:12; *see also* Hodapp Decl., ¶ 11, Ex. G at EY000100.)  Managers likewise confirmed that Ho worked largely independently.  As one of the managers for whom Ho did the most work stated, "David always analyzed the complete information on his own and drew up a list of the potential questions and follow-up items prior to seeking the input of the product lead.  David's work products required very little conceptual rework." (Ho Tr., Ex. 6 at 122; *id.*, 174:10-175:2.)  Another manager remarked that Ho "did a great job managing a foreign liquidation project with little assistance from me or the TSC."  (Hodapp Decl., ¶ 11, Ex. G at EY000112.)

> **4.      Ho was primarily engaged – or at least *expected* to be primarily engaged – in exempt work.**

The Wage Order further instructs that an administrative employee must be "primarily engaged in duties that meet the test of the exemption."  8 Cal. Code Regs. § 11040(A)(2)(f).  The FLSA regulations, including the regulations discussed above defining work "directly related to management policies or general business operations of [the] employer or [the] employer's customers," 29 C.F.R. § 541.205, and "the exercise of discretion and independent judgment," 29 C.F.R. § 541.207, guide the determination of what types of activities constitute exempt and non-exempt work.  8 Cal. Code Regs. § 11040(A)(2)(f).  Those regulations specifically provide that the administrative exemption includes "those who can be described as staff rather than line employees, or as functional rather than departmental heads.  *They include among others employees who act as advisory specialists to the management.  Typical examples of such advisory specialists are tax experts*, insurance experts, sales research experts, wage-rate analysts, investment consultants, foreign exchange consultants, and statisticians."  29 C.F.R. § 541.201(a)(2) (emphasis added).

> **a)      Ho's deposition testimony establishes that exempt duties consumed the majority of his working time.**

Ho's deposition testimony paints the portrait of a tax expert primarily engaged in exempt work.  As described in detail above, Ho testified that he conducted substantial research and analysis with respect to a variety of tax issues (Ho Tr. 209:9-211:24, 95:23-96:3, 100:22-105:6, 166:19-167:11; Conway Decl., ¶ 4, Ex. 3 at MPS-000004, MPS-000007, MPS-000012-MPS-000013), drafted lengthy,

"in-depth" client memos (Ho Tr., 152:24-155:25, 73:12-74:23, 209:9-211:24, 149:7-150:6 & Ex. 4 at 021; Conway Decl., ¶ 4, Ex. 3 at MPS-000004, MPS-000007, MPS-000012-MPS-000013), and communicated extensively with clients (Ho Tr., 158:1-17, 161:8-163:21, 167:12-15 & Ex. 4).  In fact, Ho answered clients' questions directly (*id.*, 145:24-146:24, 147:9-22 & Ex. 4 at 020), brought clients suggestions (*e.g.*, Ho Tr. 162:8-163:21, 69:9-73:6; Conway Decl., ¶ 4, Ex. 3 at MPS-000003-MPS-000004), and served as the "primary ITS contact" for several clients (Ho Tr., Ex. 4 at 020).  While Ho alleges that he was primarily engaged in "filing papers, organizing and assembling documents, taking notes of meetings, [and] entering spreadsheet data and formatting spreadsheets" (Complaint, ¶ 11), Ho understood that his work was an important component of the "overall solution" that allowed clients to achieve significant tax savings (Ho Tr. 75:5-77:8).  Moreover, the applicable federal regulations recognize that exempt work includes "routine work without which the employee's more important work cannot be performed properly," and "routine tasks . . . . which an administrative employee may reasonably be expected to perform in connection with carrying out his administrative functions including duties which either facilitate or arise incidentally from the performance of such functions and are commonly performed in connection with them." 29 C.F.R. § 541.208(b); *id.*, § 541.202(c).  The regulations, in fact, specifically identify taking "extensive notes" and typing them as examples of tasks that are directly related to administrative functions and thus exempt.  *Id.*, § 541.208(b); *see also Nordquist*, 32 Cal. App. 4th at p. 562 ("*[S]uch activities as gathering and summarizing the information and follow-through activities* which, if done separately by a nonexempt employee, might be seen as relatively routine . . . if it is an integral part of the administrative task, it may be counted as part of the exempt duties.") (quoting 2 Division of Labor Standards Enforcement, Operations and Procedures Manual § 10.62 (1989)) (emphasis added); *Copas*, 61 F. Supp. 2d at 1036 ("Any routine work that [plaintiff] performed, such as reviewing insurance applications for completeness, was directly and closely related to the performance of his exempt primary duties, and therefore exempt.").

In *Piscione*, another Ernst & Young consultant tried to convince the Seventh Circuit that he "merely plugged numbers into formulas derived from the Internal Revenue Code by others at Ernst & Young," but the Seventh Circuit was not persuaded:

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

> [H]e testified in his deposition that as part of his continuing education requirement he attended tax seminars to stay abreast of changes in the tax law. He applied the Internal Revenue Code provisions to clients' accounts. If problems arose in the accounts he supervised, he sent letters with potential solutions to clients and asked them to address questions to him. *In this respect, [plaintiff's] duties included activities similar to a tax consultant who the Secretary has concluded come within the exemption.*

171 F.3d at 542 (emphasis added). Like the plaintiff in *Piscione*, Ho attended continuing education classes in tax (Ho Tr. 45:24-48:19), and stayed abreast of changes in the law (*id.*, Ex. 6 at 123). Also like the *Piscione* plaintiff, Ho reviewed client material for accuracy (Ho Tr. 69:9-70:22), and for any potential tax issues (Hodapp Decl., ¶ 11, Ex. G at EY000101; Ho Tr. 149:7-25 & Ex. 4 at 022). The record evidence thus conclusively establishes that Ho was not "an individual who merely tabulated data, like the regulation's hypothetical statistician who would not fall within the administrative exemption," *Piscione*, 171 F.3d at 542, but a tax expert who was primarily engaged in significant research and analysis, and directly communicated problems and solutions to clients.

    **b)**    **To the extent that there is evidence to the contrary, it is attributable to Ho's own substandard work performance and is not a valid basis for denying summary judgment.**

    Even if there is evidence that Ho devoted less than half his working time to exempt tasks, this Court must "consider whether [Ho]'s practice diverges from [Ernst & Young]'s realistic expectations, whether there was any concrete expression of employer displeasure over [Ho]'s substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Ramirez*, 20 Cal. 4th at 802; *see also Walsh v. IKON Office Solutions, Inc.*, 148 Cal. App. 4th 1440, 1456 (2007) (holding that under *Ramirez*, a trial court must "inquire into the realistic requirements of the job including not only how the employee spends his or her time but also whether the employee's practice diverges from the employer's realistic expectations and realistic views of the employee's performance"); 8 Cal. Code Regs. § 11040(A)(2)(f).

    The record is replete with ways in which Ho's performance diverged from Ernst & Young's realistic expectations of its staff and senior employees – expectations of which Ho was well aware when he started the job (Ho Tr. 36:18-37:8, 39:11-41:5, 94:9-25). Ernst & Young realistically expected its professional employees to spend 70 to 80 percent of their time on client billable matters (Ho Tr.

22

41:2-5); Ho spent 36 to 40 percent of his time on client billable matters (*id.*, 42:4-43:4). Ernst & Young realistically expected its professional employees to "take responsibility for meeting client needs" (Hodapp Decl., ¶ 7, Ex. C at 009); Ho consistently arrived to work late despite the fact that "it was essential to begin the work day early in order to get in contact with [clients located in time zones east of California]" (Ho Tr., Ex. 6 at 124). Ernst & Young realistically expected its professional employees to grasp and analyze the key issues, and to "apply theoretical knowledge to practical business problems" (Hodapp Decl., ¶ 5, Ex. A at EY000149); Ho's analytical skills were lacking, and he "appeared to have difficulties matching the tax technical concepts of the project with the project tasks" (Hodapp Decl., ¶8, Ex. D at 120; Ho Tr., Ex. 6 at 122). Ernst & Young realistically expected its professional employees to "challenge[] the way things are done," and "experiment with new ideas" (Hodapp Decl., ¶7, Ex. C at 013); Ho "merely [did] what [wa]s asked of him" (Hodapp Decl., ¶ 11, Ex. G at EY000114; *see also id.* at EY000101, EY000110).

Specifically with respect to senior professionals, Ernst & Young realistically expected its seniors to "inspire[] confidence" in clients "by answering questions within [their] area of required skill and by demonstrating a professional demeanor" (Hodapp Decl., ¶7, Ex. C at 009); Ho as a senior was unable to communicate with clients "in a clear and concise manner" (Ho Tr., Ex. 6 at 121; *see also* Hodapp Decl., ¶ 11, Ex. G at EY000101, EY000136). Ernst & Young realistically expected its senior professionals to "consistently reach fully supported and accurate conclusions" (Hodapp Decl., ¶ 6, Ex. B at EY000165); Ho as a senior failed to pay adequate "attention to details," and the "overall quality" of his work product was inferior (Hodapp Decl., ¶10, Ex. F at 113-114; Ho Tr., Ex. 6 at 122).

The record, in short, abounds with "concrete expression[s]" of Ernst & Young's "displeasure over [Ho's] substandard performance," *Ramirez*, 20 Cal. 4th at 802, and leaves no room for doubt that if Ho spent less than half his working hours engaged in exempt activities, only he is to blame. As the California Supreme Court held in *Ramirez*, "an employee who is supposed to be engaged in [exempt] activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption." *Id.*; *see also Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 487 (E.D. Cal. 2006) (determining whether Route Sales Drivers fell within outside salesperson exemption based on employer's "requirements and

23

realistic expectations" because "[w]ere the Court to rely solely on the actual activity of Route Sales Drivers, an employee assigned to sell might evade the outside sales exemption by his own substandard performance") (citations and internal quotations omitted); *Walsh*, 148 Cal. App. 4th at 1456 (acknowledging that the hours an employee devoted to exempt activities "might be reduced by the employee's own substandard performance"). Because Ho cannot mount a challenge to Ernst & Young's exemption classification on the basis of his own well-documented underperformance, summary judgment is appropriate.

### 5.   Ho's monthly salary well exceeded twice the state minimum wage.

Finally, California's Wage Order requires that an administratively exempt employee "earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." 8 Cal. Code Regs. § 11040(g).

Ho testified that his starting annual salary at Ernst & Young was $75,000 (not including the $10,000 starting bonus), and was eventually raised to $80,400. (Ho Tr., Ex. 3; Ho Tr. 152:4-17.)  Ho's monthly salary when he started in 2000 was thus $6,250, more than *six* times the state minimum wage, which at the time was $997 per month (http://www.dir.ca.gov/IWC/MinimumWageHistory.htm).  *See Perine*, 457 F. Supp. 2d at 1011 n.5 (applying minimum wage in force when plaintiff was employed to determine whether plaintiff satisfied administrative exemption's salary test).  By the time Ho was terminated in December 2002, the monthly minimum wage had increased to $1,170 (http://www.dir.ca.gov/IWC/MinimumWageHistory.htm), but Ho was now earning $6,700 monthly, still nearly six times the state minimum wage.  Ho's salary, in short, indisputably exceeded twice the minimum wage at all times that he was employed by Ernst &Young.

### B.   Ernst & Young's Proper Classification Precludes Ho From Recovering On Any Of The Causes Of Action Identified In His Complaint.

Given that Ho was properly classified as exempt from California's overtime requirements, all four causes of action in Ho's Complaint fail as a matter of law.  Ho's first cause of action for unpaid overtime wages under Labor Code section 1194 explicitly relies on the theory that Ho was a "nonexempt" employee under the Wage Order (Complaint, ¶ 15), and his third and fourth causes of action for statutory interest and waiting time penalties with respect to those same unpaid wages (Complaint, ¶¶ 22-28) are obviously derivative of the section 1194 claim.

Ho's UCL claim is also tightly moored to his Labor Code section 1194 claim.  Ho alleges in his second cause of action that Ernst & Young's purported misclassification constitutes an "unlawful business practice in violation of the provisions of Business and Professions Code §§ 17200 et seq." (Complaint, ¶ 20.)  An unlawful business practice claim, however, "requires a violation" of the "borrow[ed]" predicate statute – here, Labor Code section 1194 – and "[a] defense to the underlying offense is a defense under the [UCL]."  *Irwin v. Mascott*, 94 F. Supp. 2d 1052, 1057 (N.D. Cal. 2000) (citing *People v. Duz-Mor Diagnostic Laboratory, Inc.*, 68 Cal. App. 4th 654, 673 (1998)); *People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1087 (2001).  Ho's Labor Code and UCL claims are thus simultaneously wrecked by the undisputed evidence that Ho was properly classified as exempt from California's overtime requirements.

**V.     CONCLUSION**

For the foregoing reasons, Ernst & Young is entitled to summary judgment on all of Ho's claims.

Dated:  July 5, 2007

AKIN GUMP STRAUSS HAUER & FELD LLP
Catherine A. Conway
Gregory W. Knopp

By _____
        Catherine A. Conway

Attorneys for Defendant Ernst & Young LLP

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  2029 Century Park East, Suite 2400, Los Angeles, California 90067.  On July 5, 2007, I served the foregoing document(s) described as: **DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT** on the interested party(ies) below, using the following means:

**All parties identified for Notice of Electronic Filing generated by the Court's CM/ECF system under the referenced case caption and number**

☒ BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION.  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 5, 2007 at Los Angeles, California.

Tracy Howe
[Print Name of Person Executing Proof]                                    [Signature]

---

**DEFENDANT ERNST & YOUNG LLP'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT**