# FOLKENFLIK & McGERITY

**ATTORNEYS AT LAW**

1500 BROADWAY
NEW YORK, NEW YORK 10036
———
TELEPHONE: 212-757-0400
FAX: 212-757-2010

WRITER'S E-MAIL: MAX@FMLAW.NET

January 9, 2012

***VIA FEDEX***

Hon. Ronald M. Whyte, Senior District Judge
San Jose Federal Courthouse
Courtroom 6 - 4th Floor
280 South 1st Street
San Jose, CA 95113

> **Re:**  ***Ho v. Ernst & Young***
> USDC, Northern District of California Case No.:
> CV 05-04867- RMW (HRL)
> (Consolidated for Class Certification Purposes with Case Nos. C-08-4988-RMW and C-08-2853-RMW)

Dear Judge Whyte:

    I am writing to advise the Court of a January 3, 2012 decision by the National Labor Relations Board, *D.R. Horton, Inc.* NLRB Case No. 12-CA-25764 (Jan. 3, 2012), (a copy of which is enclosed), which I learned about after the argument on Friday. The decision in *D.R. Horton* invalidates agreements containing class action waivers such as the arbitration agreement Ernst & Young seeks to enforce in this action. That decision is significant in that it provides yet another hurdle Defendant will be unable to surmount on appeal, thereby supporting denial of Defendant's motion to stay, and provides Mr. Morris with a strong defense to any motion to compel arbitration, thereby eliminating Defendant's "futility" argument on Plaintiffs' Motion for Leave to Add a New Plaintiff.

    In *D.R. Horton* in a lengthy and scholarly review of the relevant statutes and decisional law, the Board held that an agreement which is entered into as a condition of employment which prohibits employee participation in collective judicial or arbitral action to address employment-related grievances is a violation of Section 7 of the National Labor Relations Act ("NLRA"), *D.R. Horton,* at 4, as well as unenforceable under Section 15 of the Norris LaGuardia Act.1 *Id.* at 5-6.

---

1 As the Board explained:

> In fact, the provisions of the Norris-LaGuardia Act prohibit the enforcement of a broad array of "yellow dog"-like contracts, including agreements comparable to that at issue here. Section 2 of the

FOLKENFLIK & McGERITY

Hon. Ronald M. Whyte, Senior District Judge
January 9, 2012
Page 2

This holding expressly was applied by the Board to cover employment related litigation under State law, as well as claims under federal law, since any such suit would be a "labor dispute" under Section 13 of the Norris-LaGuardia Act. The Act covers any "controversy concerning terms and conditions of employment…" *See, e.g. Id.* at 6. The Board held: "an arbitration agreement imposed upon individual employees as a condition of employment cannot be held to prohibit employees from pursuing an employment-related class, collective, or joint action in a Federal or State court." *Id.* "[G]eneral principles of administrative law requir[e] deference to an agency's interpretation of the statutes it is charged with administering." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 159 (2d Cir. 2007); *See also, Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844 (1984)("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 830 (1984)("we have not hesitated to defer to the Board's interpretation of the [NLRA]"). The Norris-LaGuardia Act by its terms prohibits this Court from entering an order compelling individual arbitration. *See,* 29 U.S.C. § 103. Unlawfulness under Section 7 of the NLRA is a basis for denial of relief on public policy grounds as incorporated into Section 2 of the FAA.

"The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron, U.S.A., Inc.* at 843. The Board's decision reconciles the Board's interpretation of the NLRA and the Norris-LaGuardia Act, with the Federal Arbitration Act and Supreme Court rulings interpreting the FAA including notably *AT&T Mobility LLC v. Concepcion,* ___ U.S. ___, 131 S. Ct. 1740 (2011), and *Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010). The decision surely "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and the Court] should not

---

Norris-LaGuardia Act, which declares the "public policy of the United States," observes that the "individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment." 29 U.S.C. § 102. Accordingly, Congress determined that workers should "have full freedom of association" and "shall be free from the interference, restraint, or coercion of employers" in "concerted activities for the purpose of collective bargaining *or other mutual aid or protection*." *Id.* (*emphasis added*). In turn, Section 3 of the statute provides that "*any .. .* undertaking or promise in conflict with the public policy declared in" Section 2—not only the "yellow dog" contract—"is declared to be contrary to the public policy of the United States, shall not be enforceable in any court of the United States and shall not afford any basis for the granting of legal or equitable relief by any such court." 29 U.S.C. § 103 (*emphasis added*).

*D.R. Horton*, at 3.

FOLKENFLIK & McGERITY

Hon. Ronald M. Whyte, Senior District Judge
January 9, 2012
Page 3


disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron, U.S.A., Inc.* at 845.

There is no evidence of any lack of Congressional sanction for the Board's interpretation that a ban on collective action violates the NLRA and the Norris-LaGuardia Act. To the contrary, Section 2 of the FAA expressly contemplates denying enforcement to agreements which are in violation of law.[2]  The FAA was passed in 1925, and both the Norris-LaGuardia Act (1932) and the NLRA (1935) were subsequent statutes.  The Norris-LaGuardia Act contains an express repeal of prior inconsistent statutes in Section 15. 29 U.S.C. § 115.  ("**Repeal of conflicting laws**.  All Acts and parts of Acts in conflict with the provisions of this Act are hereby repealed.").  Moreover, in accordance with long settled law, if the FAA were considered to be in irreconcilable conflict with the Norris-Laguardia Act or the NLRA, than those later passed statutes would be enforced, and not the FAA. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976)("where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one").

The decision in *D.R. Horton* presents alternative grounds on which to deny Defendant's Motion for a Stay and it eliminates the "futility" objection to Plaintiffs' Motion to Add a New Plaintiff.

Respectfully,

Max Folkenflik

MF/vm
Attachment

---

2 Section 2 of the FAA provides:

§ 2.  Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 USCS § 2. (*emphasis added*).

FOLKENFLIK & M<sup>c</sup>GERITY

Hon. Ronald M. Whyte, Senior District Judge
January 9, 2012
Page 4


cc:    Catherine A. Conway *(via e-mail)*
       Gregory W. Knopp, Esq. *(via e-mail)*
       Joel Cohn, Esq. *(via e-mail)*
       Daniel L. Nash, Esq. *(via e-mail)*
       Ross Libenson, Esq. *(via e-mail)*
       H. Tim Hoffman, Esq. *(via e-mail)*
       Leon Greenberg, Esq. *(via e-mail)*
       Arthur W. Lazear, Esq. *(via e-mail)*

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

D. R. Horton, Inc. *and* Michael Cuda. Case 12–CA–25764

January 3, 2012

## DECISION AND ORDER

### BY CHAIRMAN PEARCE AND MEMBERS BECKER AND HAYES

In this case, we consider whether an employer violates Section 8(a)(1) of the National Labor Relations Act when it requires employees covered by the Act, as a condition of their employment, to sign an agreement that precludes them from filing joint, class, or collective claims addressing their wages, hours or other working conditions against the employer in any forum, arbitral or judicial. For the reasons stated below, we find that such an agreement unlawfully restricts employees' Section 7 right to engage in concerted action for mutual aid or protection, notwithstanding the Federal Arbitration Act (FAA), which generally makes employment-related arbitration agreements judicially enforceable.[1] In the circumstances presented here, there is no conflict between Federal labor law and policy, on the one hand, and the FAA and its policies, on the other.

### I. BACKGROUND

Respondent D. R. Horton, Inc. is a home builder with operations in more than 20 states. In January 2006, the Respondent, on a corporate-wide basis, began to require each new and current employee to execute a "Mutual Arbitration Agreement" (MAA) as a condition of employment. The MAA provides in relevant part:

- that all disputes and claims relating to the employee's employment with Respondent (with exceptions not pertinent here) will be determined exclusively by final and binding arbitration;

- that the arbitrator "may hear only Employee's individual claims," "will not have the authority to consolidate the claims of other employees," and "does not have authority to fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding"; and

- that the signatory employee waives "the right to file a lawsuit or other civil proceeding relating to Employee's employment with the Company" and "the right to resolve employment-related disputes in a proceeding before a judge or jury."

In sum, pursuant to the MAA, all employment-related disputes must be resolved through individual arbitration, and the right to a judicial forum is waived. Stated otherwise, employees are required to agree, as a condition of employment, that they will not pursue class or collective litigation of claims in any forum, arbitral or judicial.

Charging Party Michael Cuda was employed by the Respondent as a superintendent from July 2005 to April 2006. Cuda's continued employment was conditioned on his signing the MAA, which he did. In 2008, his attorney, Richard Celler, notified the Respondent that his firm had been retained to represent Cuda and a nationwide class of similarly situated superintendents. Celler asserted that Respondent was misclassifying its superintendents as exempt from the protections of the Fair Labor Standards Act (FLSA), and he gave notice of intent to initiate arbitration. The Respondent's counsel replied that Celler had failed to give an effective notice of intent to arbitrate, citing the language in the MAA that bars arbitration of collective claims.

Cuda filed an unfair labor practice charge, and the General Counsel issued a complaint alleging that the Respondent violated Section 8(a)(1) by maintaining the MAA provision stating that the arbitrator "may hear only Employee's individual claims and does not have the authority to fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding." The complaint further alleged that the Respondent violated Section 8(a)(4) and (1) by maintaining arbitration agreements requiring em-

---

[1] On January 3, 2011, Administrative Law Judge William N. Cates issued the attached decision. The Acting General Counsel and the Respondent each filed exceptions, a supporting brief, and an answering brief. The Acting General Counsel filed a reply brief. In addition, the Respondent filed a supplemental brief in support of its exceptions and in opposition to the Acting General Counsel's exceptions, and the Acting General Counsel filed a letter in response.

On June 16, 2011, the National Labor Relations Board issued an invitation to interested amici curiae to file briefs. Amicus briefs were filed by American Federation of Labor-Congress of Industrial Organizations (AFL–CIO); Change to Win; Coalition for a Democratic Workplace; Council on Labor Law Equality; Equal Employment Advisory Council, HR Policy Association, Society for Human Resource Management, California Employment Law Council, and Employers Group; National Retail Federation; Pacific Legal Foundation; Public Justice, P.C.; National Employment Lawyers Association, et al.; Retail Industry Leaders Association; Service Employees International Union, Alton Sanders, and Taylor Bayer; Spiro Moss LLP; United States Chamber of Commerce; and United States Secretary of Labor and Equal Employment Opportunity Commission (EEOC). The Respondent filed three answering briefs in response to the briefs of various amici.

Member Hayes is recused and did not participate in deciding the merits of the case.

ployees, as a condition of employment, "to submit all employment related disputes and claims to arbitration . . . , thus interfering with employee access to the [NLRB]."

The judge found that the MAA violated Section 8(a)(4) and (1) because its language would lead employees reasonably to believe that they were prohibited from filing unfair labor practice charges with the Board. We affirm the judge's finding of a Section 8(a)(1) violation in this respect, essentially for the reasons stated by the judge.[2]

The judge dismissed the allegation that the class-action waiver violated Section 8(a)(1). For the reasons stated below, we reverse the judge and find the violation.

## II. DISCUSSION

### A. The MAA Prohibits the Exercise of Substantive Rights Protected by Section 7 of the NLRA

#### 1.

Section 7 of the NLRA vests employees with a substantive right to engage in specified forms of associational activity. It provides in relevant part that employees shall have the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. §157. It is well settled that "mutual aid or protection" includes employees' efforts to "improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–566 (1978). The Supreme Court specifically stated in *Eastex* that Section 7 "protects employees from retaliation by their employer when they seek to improve

their working conditions through resort to administrative and judicial forums." Id. at 565-566. The same is equally true of resort to arbitration.

The Board has long held, with uniform judicial approval, that the NLRA protects employees' ability to join together to pursue workplace grievances, including through litigation. Not long after the Act's passage, the Board held that the filing of a Fair Labor Standards Act suit by three employees was protected concerted activity, see *Spandsco Oil & Royalty Co.*, 42 NLRB 942, 948–949 (1942), as was an employee's circulation of a petition among coworkers, designating him as their agent to seek back wages under the FLSA, see *Salt River Valley Water Users Ass'n*, 99 NLRB 849, 853–854 (1952), enfd. 206 F.2d 325 (9th Cir. 1953).[3] In the decades that followed, the Board has consistently held that concerted legal action addressing wages, hours or working conditions is protected by Section 7.[4]

Collective pursuit of a workplace grievance in arbitration is equally protected by the NLRA. When the grievance is pursued under a collectively-bargained grievance-arbitration procedure, the Supreme Court has observed, "No one doubts that the processing of a grievance in such

---

[2] The violation follows directly from the Board's decisions in *Bill's Electric*, 350 NLRB 292, 296 (2007), and *U-Haul Co. of California*, 347 NLRB 375 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007), where arbitration policies contained language that, if anything, was more ambiguous concerning the preclusion of Board charges than the MAA here. It is clear that the language of the MAA reasonably would lead employees to believe that they were prohibited from filing charges with the Board. Sec. 1 of the MAA states that all disputes between employees and the Respondent "shall be determined exclusively by final and binding arbitration," and no exception for unfair labor practice charges is made. Sec. 6 of the MAA, in turn, waives the "right to file a lawsuit *or other civil proceeding* relating to . . . employment." No extrinsic evidence counters the clear implications of the MAA's language. True, the Respondent furnished its supervisors a list of frequently asked questions about the MAA, together with appropriate responses, and one response was to tell employees who expressed concern about the scope of the MAA that they would still be able to bring complaints to the EEOC or similar agencies. But there is no evidence that the Respondent ever communicated this ambiguous clarification to its employees.

We find it unnecessary to pass on the judge's 8(a)(4) finding, because that additional violation would not materially affect the remedy.

[3] In *Salt River Valley*, supra the Ninth Circuit observed:

By soliciting signatures to the petition, [the employee] was seeking to obtain such solidarity among the [workers] as would enable group pressure upon the [employer] in regard to possible negotiation and adjustment of the [workers'] claims. If suit were filed, such solidarity might enable more effective financing of the expenses involved. Thus, in a real sense, circulation of the petition was for "mutual aid or protection." The [employer] argues that any legal rights to backpay on the part of the [workers] were individual rights and that therefore there could be no "mutual" aid or protection. But the [employer] ignores the fact that "concerted activity for the purpose of . . . mutual aid or protection" is often an effective weapon for obtaining that to which the participants, as individuals, are already "legally" entitled.

206 F.2d at 328.

[4] See, e.g., *Le Madri Restaurant*, 331 NLRB 269, 275 (2000) ("the filing of a civil action by employees is protected activity unless done with malice or in bad faith"), *Trinity Trucking & Materials Corp.*, 221 NLRB 364, 365 (1975), enfd. mem. 567 F.2d 391 (7th Cir. 1977), cert. denied 438 U.S. 914 (1978) (same); *United Parcel Service*, 252 NLRB 1015, 1018, 1022 fn. 26 (1980), enfd. 677 F.2d 421 (6th Cir. 1982) (class-action lawsuit alleging that employer failed to provide rest periods required by state statute was protected concerted activity). See generally Ann C. Hodges, *Can Compulsory Arbitration Be Reconciled with Section 7 Rights?*, 38 Wake Forest L. Rev. 173, 187–200 (2003) (tracing doctrinal developments).

The Board's position has been uniformly upheld by the courts of appeals. See, e.g., *Brady v. National Football League*, 644 F.3d 661, 673 (8th Cir. 2011) ("a lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment *is* 'concerted activity' under § 7 of the National Labor Relations Act") (emphasis in original); *Mohave Elec. Co-op, Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000) (petition for injunction supported by fellow employees and co-signed by a coworker was protected concerted activity).

a manner is concerted activity within the meaning of §
7." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822,
836 (1984). And the same is true when the grievance is
pursued under a unilaterally created grievance/arbitration
procedure so long as its pursuit is concerted. Thus, the
Board held in 1976,

> It is equally well settled that the advancement of a col-
> lective grievance is protected activity, even if the griev-
> ance in question is not formally stated or does not take
> place under the auspices of a contractual grievance pro-
> cedure. *N.L.R.B.* v. *Washington Aluminum Company,
> Incorporated,* 370 U.S. 9 (1962); *N.L.R.B.* v. *Walls
> Manufacturing Company,* 321 F.2d 753 (C.A.D.C.,
> 1963); *N.L.R.B.* v. *Hoover Design Corporation,* 402
> F.2d 987 (C.A. 6, 1968).

*Clara Barton Terrace Convalescent Center,* 225 NLRB
1028, 1033 (1976). See also *Brad Snodgrass, Inc.,* 338
NLRB 917, 923 (2003) (nonemployee business agent was
"engaging in protected activity on behalf of Respondent's
employees when as Local 20's business agent he initiated
grievances and complaints on their behalf while he was
attempting to enforce what he believed to be . . . the appli-
cable collective-bargaining agreements"); *UForma/Shelby
Business Forms,* 320 NLRB 71, 77 (1995), enf. denied on
other grounds 111 F.3d 1284 (6th Cir. 1997) (elimination of
shift violated Sec. 8(a)(3) when done in retaliation for union
members' pursuit of grievance to arbitration); *El Dorado
Club,* 220 NLRB 886 (1975), enfd. 557 F.2d 692 (9th Cir.
1977) (employee was unlawfully discharged for participat-
ing in another employee's arbitration). Thus, employees
who join together to bring employment-related claims on a
classwide or collective basis in court or before an arbitrator
are exercising rights protected by Section 7 of the NLRA.

In enacting the NLRA, Congress expressly recognized
and sought to redress "[t]he inequality of bargaining
power between employees who do not possess full free-
dom of association . . . and employers who are organized
in the corporate form or other forms of ownership asso-
ciation." 29 U.S.C. § 151. Congress vested employees
with "full freedom of association . . . for the purpose of
. . . mutual aid or protection," in order to redress that
inequality. Id. Both the Board and the courts have rec-
ognized that collective enforcement of legal rights in
court or arbitration serves that congressional purpose.
For example, the Ninth Circuit explained in *Salt River
Valley,* supra at 328, "By soliciting signatures to the peti-
tion, [the employee] was seeking to obtain such solidar-
ity among the [workers] as would enable group pressure
upon the [employer] in regard to possible negotiation and
adjustment of the [workers'] claims. If suit were filed,
such solidarity might enable more effective financing of

the expenses involved. Thus, in a real sense, circulation
of the petition was for 'mutual aid or protection.'" Em-
ployees are both more likely to assert their legal rights
and also more likely to do so effectively if they can do so
collectively. Cf. *Special Touch Home Care Services,*
357 NLRB No. 2, slip op. at 7 (2011) ("The premises of
the Act . . . and our experience with labor-management
relations all suggest that permitting an employer to com-
pel employees to provide individual notice of participa-
tion in collective action would impose a significant bur-
den on the right to strike).[5]

Depending on the applicable class or collective action
procedures, of course, a collective claim or class action
may be filed in the name of multiple employee-plaintiffs
or a single employee-plaintiff, with other class members
sometimes being required to opt in or having the right to
opt out of the class later. See, e.g., 29 U.S.C. § 216(b);
Fed. R. Civ. P. 23(c)(2)(B)(v). To be protected by Sec-
tion 7, activity must be concerted, or "engaged in with or
on the authority of other employees, and not solely by
and on behalf of the employee himself." *Meyers Indus-
tries,* 281 NLRB 882, 885 (1986), affd. sub nom. *Prill v.
NLRB,* 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487
U.S. 1205 (1988). When multiple named-employee-
plaintiffs initiate the action, their activity is clearly con-
certed. In addition, the Board has long held that con-
certed activity includes conduct by a single employee if
he or she "seek[s] to initiate or to induce or to prepare for
group action." *Meyers,* supra at 887. Clearly, an indi-
vidual who files a class or collective action regarding
wages, hours or working conditions, whether in court or
before an arbitrator, seeks to initiate or induce group ac-
tion and is engaged in conduct protected by Section 7.

These forms of collective efforts to redress workplace
wrongs or improve workplace conditions are at the core
of what Congress intended to protect by adopting the
broad language of Section 7. Such conduct is not pe-
ripheral but central to the Act's purposes. After all, if the
Respondent's employees struck in order to induce the
Respondent to comply with the FLSA, that form of con-
certed activity would clearly have been protected. See
*NLRB v. Washington Aluminum Co.,* 370 U.S. 9 (1962).

---

[5] Employees surely understand what several federal courts have rec-
ognized: that named plaintiffs run a greater risk of suffering unlawful
retaliation than unnamed class members. See *Ansoumana v. Gristede's
Operating Corp.,* 201 F.R.D. 81, 85–86 (S.D.N.Y. 2001); *Ingram v.
Coca-Cola Co.,* 200 F.R.D. 685, 701 (N.D. Ga. 2001); *Adams v. Mitsu-
bishi Bank Ltd.,* 133 F.R.D. 82, 89 (E.D.N.Y. 1989); *Slanina v. William
Penn Parking Corp.,* 106 F.R.D. 419, 423–424 (W.D. Pa. 1984). This
risk of retaliation is virtually unique to employment litigation com-
pared, for example, to securities or consumer fraud litigation. Thus, in
a quite literal sense, named-employee-plaintiffs protect the unnamed
class members.

Surely an Act expressly stating that "industrial strife" can be "avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with one another," equally protects the concerted pursuit of workplace grievances in court or arbitration. To hold otherwise, the Supreme Court recognized in *Eastex*, "could 'frustrate the policy of the Act to protect the right of workers to act together to better their working conditions.'" 437 U.S. at 567 (quoting *Washington Aluminum*, 370 U.S. at 14).

As stated above, the MAA requires employees, as a condition of their employment, to refrain from bringing collective or class claims in any forum: in court, because the MAA waives their right to a judicial forum; in arbitration, because the MAA provides that the arbitrator cannot consolidate claims or award collective relief. The MAA thus clearly and expressly bars employees from exercising substantive rights that have long been held protected by Section 7 of the NLRA.[6]

### 2.

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7. 29 U.S.C. §158(a)(1). The MAA was imposed on all employees as a condition of hiring or continued employment by the Respondent, and it is properly treated as the Board treats other unilaterally implemented workplace rules. In evaluating whether an employer has violated Section 8(a)(1) by maintaining such a mandatory arbitration policy, the Board thus applies the test set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004). See *U-Haul Co. of California*, 347 NLRB 375, 377 (2006), enfd. 255 Fed.Appx. 527 (D.C. Cir. 2007) (finding policy unlawful because employees would reasonably read it to require resort to arbitration and preclude filing of Board charges). Under *Lutheran Heritage Village*, our inquiry begins with whether the rule explicitly restricts activities protected by Section 7. If so, the rule is unlawful. If the rule does not explicitly restrict protected activity, the finding of a violation is dependent upon a showing of one of the following: (1) employees would reasonably construe the rule to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the

exercise of Section 7 rights. 343 NLRB at 646–647. We find that the MAA expressly restricts protected activity.

That this restriction on the exercise of Section 7 rights is imposed in the form of an agreement between the employee and the employer makes no difference. From its earliest days, the Board, again with uniform judicial approval, has found unlawful employer-imposed, individual agreements that purport to restrict Section 7 rights – including, notably, agreements that employees will pursue claims against their employer only individually.[7]

In *National Licorice Co. v. NLRB*, 309 U.S. 350 (1940), the Supreme Court upheld the Board's holding that individual employment contracts that included a clause discouraging, if not forbidding, a discharged employee from presenting his grievance to the employer "through a labor organization or his chosen representatives, or in any way except personally" was unlawful and unenforceable. Id. at 360.[8] The Court agreed that the contracts "were a continuing means of thwarting the policy of the Act. Id. at 361. "Obviously," the Court concluded, "employers cannot set at naught the National Labor Relations Act by inducing their workmen to agree not to demand performance of the duties which it imposes." Id. at 364.

Four years later, the Court reaffirmed the principle that employers cannot enter into individual agreements with employees in which the employees cede their statutory rights to act collectively. In *J. I. Case Co. v. NLRB*, 321 U.S. 332 (1944), the Court held that individual employment contracts predating the certification of a union as the employees' representative cannot limit the scope of the employer's duty to bargain with the union. The Supreme Court observed that:

> Individual contracts no matter what the circumstances that justify their execution or what their

---

[6] The Respondent argues that the MAA's restriction on class or collective actions in arbitration is phrased as a restriction not on employees, but on the authority of the arbitrator. We find the distinction is one of form and not substance. The MAA bars employees from pursuing their claims in any forum except arbitration and precludes collective actions in that arbitral forum. The result is that there is no forum in which employees may pursue a class or collective claim.

[7] See, e.g., *Adel Clay Products Co.*, 44 NLRB 386, 396 (1942), enfd. 134 F.2d 342 (8th Cir. 1943) (finding unlawful employer's conditioning employment on the signing of individual agreements not to engage in self-organization and collective bargaining); *Western Cartridge Co.*, 44 NLRB 1, 7–8 (1942), enfd. 134 F.2d 240, 243–44 (7th Cir. 1943) (same); *Jahn & Ollier Engraving Co.*, 24 NLRB 893, 900–901, 909–911 (1940), enfd. 123 F.2d 589, 593 (7th Cir. 1941) (finding unlawful individual "profit-sharing" agreements that forfeited employees' right to negotiate wage increases and to strike); *Vincennes Steel Corp.*, 17 NLRB 825, 831–833 (1939), enfd. 117 F.2d 169, 172 (7th Cir. 1941) (finding unlawful employer's stock purchase plan, which required subscribing employees to agree not to seek wage increases; "[t]he individual agreements to refrain from requesting wage increases constitute on their face, a limitation on the exercise of the right to engage in concerted activities and to bargain collectively regarding wages").

[8] The clause permitted the discharged employee to present facts contesting the reasonableness of his discharge, but provided that the "question as to the propriety of an employee's discharge is in no event to be one for arbitration or mediation." *Nat'l Licorice Co.*, 309 U.S. at 360.

terms, may not be availed of to defeat or delay the procedures prescribed by the National Labor Relations Act. . . .

        . . . .

Wherever private contracts conflict with [the Board's] functions [of preventing unfair labor practices], they obviously must yield or the Act would be reduced to a futility.

Id. at 337.

During this same period of time, the Board held unlawful a clause in individual employment contracts that required employees to attempt to resolve employment disputes individually with the employer and then provided for arbitration. *J. H. Stone & Sons*, 33 NLRB 1014 (1941), enfd. in relevant part, 125 F.2d 752 (7th Cir. 1942).[9] "The effect of this restriction," the Board explained, "is that, at the earliest and most crucial stages of adjustment of any dispute, the employee is denied the right to act through a representative and is compelled to pit his individual bargaining strength against the superior bargaining power of the employer." Id. at 1023 (footnote omitted). The Seventh Circuit affirmed the Board's holding, describing the contract clause as a *per se* violation of the Act, even if "entered into without coercion," because it "obligated [the employee] to bargain individually" and was a "restraint upon collective action." *NLRB v. Stone*, 125 F.2d 752, 756 (7th Cir. 1942).[10] These precedents compel the conclusion that the MAA violates the NLRA.

Just as the substantive right to engage in concerted activity aimed at improving wages, hours or working conditions through litigation or arbitration lies at the core of the rights protected by Section 7, the prohibition of individual agreements imposed on employees as a means of requiring that they waive their right to engage in pro-

tected, concerted activity lies at the core of the prohibitions contained in Section 8. Understanding why this is so requires consideration of the origins of Section 7 rights. In construing the NLRA, we must "reconstitute the gamut of values current at the time when the words [of the statute] were uttered." *National Woodwork Mfrs. Assn. v. NLRB*, 386 U.S. 612, 620 & fn. 5 (1967).

Modern Federal labor policy begins not with the NLRA, but with earlier legislation, the Norris-LaGuardia Act of 1932,[11] which aimed to limit the power of Federal courts both to issue injunctions in labor disputes and to enforce "yellow dog" contracts prohibiting employees from joining unions.[12] Thus, Congress has aimed to prevent employers from imposing contracts on individual employees requiring that they agree to forego engaging in concerted activity since before passage of the NLRA.

In fact, the provisions of the Norris-LaGuardia Act prohibit the enforcement of a broad array of "yellow dog"-like contracts, including agreements comparable to that at issue here. Section 2 of the Norris-LaGuardia Act, which declares the "public policy of the United States," observes that the "individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment." 29 U.S.C. § 102. Accordingly, Congress determined that workers should "have full freedom of association" and "shall be free from the interference, restraint, or coercion of employers" in "concerted activities for the purpose of collective bargaining *or other mutual aid or protection.*" Id. (emphasis added). In turn, Section 3 of the statute provides that "*any* . . . undertaking or promise in conflict with the public policy declared in" Section 2—not only the "yellow dog" contract—"is declared to be contrary to the public policy of the United States, shall not be enforceable in any court of the United States and shall not afford any basis for the granting of legal or equitable relief by any such court." 29 U.S.C. § 103 (emphasis added). In specifying what acts are *not* subject to restraining orders or injunctions, Section 4 of the statute identifies various types of activity, whether undertaken "singly or in concert," including "[b]y all lawful means aiding any person participating or interested in any labor dispute who . . . is *prosecuting, any action or*

---

[9] Paragraph 8 of the contract read:

8. ADJUSTMENTS. The Company will endeavor to adjust with the Employee all complaints and disputes by negotiation, if possible. If it cannot be so adjusted, the Employee hereby selects _____ as his representative and arbitrator, and the Company selects its superintendent as its representative and they shall promptly hear and adjust all such complaints, or failing to do so shall select a third disinterested arbitrator, which three shall promptly hear, adjust and arbitrate every such complaint or dispute. The decision of a majority of such Board to be final on both Employee and Employer.

33 NLRB at 1023.

[10] For contemporary discussion of the case, see Recent Case, Labor Law—National Labor Relations Act – Arbitration Provision in Individual Contract Held to Be Unfair Labor Practice, 55 Harv. L. Rev. 1391, 1392 (1942). The Seventh Circuit's holding was anticipated by its earlier decision in a case involving the same clause in an individual employment contract. *NLRB v. Superior Tanning Co.*, 117 F.2d 881 (7th Cir. 1941), enfg. 14 NLRB 942 (1939).

---

[11] 29 U.S.C. § 101 et seq.

[12] See Edwin E. Witte, *The Federal Anti-Injunction Act*, 16 Minn. L. Rev. 638, 641–647 (1932). Since the enactment of the Norris-LaGuardia Act, all variations of a "yellow-dog" contract are deemed invalid and unenforceable, including "[a]ny promise by a statutory employee to refrain from union activity or to report the union activities of others." *Barrow Utilities & Electric*, 308 NLRB 4, 11 fn. 5 (1992).

*suit* in any court of the United States or of any State." 29 U.S.C. § 104(d) (emphasis added).[13] "Labor dispute," in turn, is broadly defined in Section 13 to include "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113. Finally, Section 15 provides that "[a]ll acts and parts of acts in conflict with the provisions of this chapter are repealed." 29 U.S.C. § 115.

The Norris-LaGuardia Act, in sum, protects concerted employment-related litigation by employees against federal judicial restraint based upon agreements between employees and their employer.   Consistent with the terms and policy of the Norris-LaGuardia Act, an arbitration agreement imposed upon individual employees as a condition of employment cannot be held to prohibit employees from pursuing an employment-related class, collective, or joint action in a Federal or State court.  Such a lawsuit would involve a "labor dispute" under Section 13 of the Norris-LaGuardia Act: a "controversy concerning terms or conditions of employment."   The arbitration agreement, insofar as it sought to prohibit a "lawful means [of] aiding any person participating or interested in" the lawsuit (Sec. 4) such as pursuing or joining a putative class action—would be an "undertaking or promise in conflict with the public policy" of the statute (Sec. 3).

The NLRA, passed in 1935, built upon and expanded the policies reflected in the Norris-LaGuardia Act, echoing much of the language of the earlier law.  As the Board has observed, "The law has long been clear that all variations of the venerable 'yellow dog contract' are invalid as a matter of law."  *Barrow Utilities & Electric,* 308 NLRB 4, 11 fn. 5 (1992).  The agreement at issue here, then, is not only bars the exercise of rights at the core of those protected by Section 7, but implicates prohibitions that predate the NLRA and are central to modern Federal labor policy.

### 3.

Some amici contend that employees' Section 7 rights are not impaired by the MAA because employees can still discuss their claims with one another, pool their resources to hire a lawyer, seek advice and litigation support from a union, solicit support from other employees, and file similar or coordinated individual claims.  It is true that the MAA does not interfere with employees' right to engage in any of these protected concerted activities.  But if the Act makes it unlawful for employers to require employees to waive their right to engage in one form of activity, it is no defense that employees remain able to engage in *other* concerted activities.  For example, if an employer refrains from interfering with concerted protests short of a strike, that does not entitle the employer to compel employees, as a condition of their employment, to waive the right to strike.  The same is true here.[14]

Several amici urge the Board to endorse the narrow theory of violation set forth in a memorandum issued in 2010 by the then General Counsel ("GC Memo 10–06"), before the complaint issued in this case.[15]  GC Memo 10–06 takes the position that a class-action waiver is not *per se* unlawful, so long as the waiver makes clear to employees that they may act concertedly to challenge the waiver itself and will not be subject to retaliation by their employer for doing so.  Thus, under the rationale of the GC Memo 10–06, employees are free to bring an employment-related class action lawsuit, but the employer may seek to have the suit dismissed on the ground that the employees executed a valid waiver.[16]

We reject the construction of the Act advanced in GC Memo 10–06 for several reasons.  First, it takes the erroneous view that an individual who files a class or collective action typically is engaged in "purely personal" activity outside the scope of Section 7.  As explained above, that view is at odds with Board precedent holding that employees' class and collective actions are protected concerted activity in that they seek to initiate concerted activity for mutual aid or protection.  The memorandum's position is also clearly wrong as a categorical matter because many class and collective actions are initiated by more than one named plaintiff, i.e., as a result of undeniably concerted activity.

---

[13]  The legislative history of the statute describes federal injunctions that prohibited aid to employees who were being evicted from employer-owned housing as a consequence of striking in violation of "yellow dog" contracts and who challenged their eviction in court:

> Federal judges have been in the habit of issuing injunctions restraining outsiders … from doing anything to assist the laborer in a forcible entry and detainer case pending in the State court.

> All persons are enjoined from furnishing bonds to take those cases up on appeal.  All persons are enjoined from paying any money in the way of expenses in connection with such litigation in the State courts. The injunctions often go far enough to prevent an attorney from giving any advice to the employee who is trying to hold possession of a house belonging to the employer.

Sen. Rep. No. 163, 72d Cong., 1st Sess. 16 (Feb. 4, 1932).

[14]  Moreover, the MAA is not a narrow ban on only one form of collective actions, pursuing a class action, but a broad ban on any form of collective litigation, including class and collective actions and even simple joinder of claims.

[15]  The Memorandum, which represents the then-General Counsel's advice to the Board's Regional Offices, is not binding on the Board.

[16]  This is not the theory underlying the complaint in this case.  It is also not the theory advanced by the General Counsel during the litigation of this case.  Therefore, there is no merit to the suggestion of Amici Equal Employment Advisory Council et al. that the Board is limited to passing on a theory of the case that is consistent with GC Memo 10–06.

Second, GC Memo 10–06 reasons that because choosing to initiate or participate in a class action is a purely individual act, waiving the right to do so is outside the scope of Section 7. At the same time, GC Memo 10–06 states that the wording of mandatory arbitration policies must make clear to employees that their right to act concertedly by pursuing class and collective claims is preserved. If a Section 7 right to litigate concertedly exists, then it defies logic to suggest, as GC Memo 10–06 does, that requiring employees to waive that right does not implicate Section 7. Moreover, the memo's rationale cannot be limited to waivers of the right to file and join class and collective actions. If choosing to initiate or participate in a class or collective action is a purely individual act, so is choosing to initiate or participate in *any* activity protected by Section 7. Based on the logic of GC Memo 10–06, an employer would be privileged to secure prospective individual waivers of *all* future Section 7 activity, including joining a union and engaging in collective bargaining. The memo's rationale is thus untenable.

Third, the memo's requirement that employers must expressly preserve employees' right to file a class or collective action challenging the validity of the required waiver has no substance. That is to say, GC Memo 10–06 does not state *on what ground* such a challenge might be brought. The memo could not have meant to suggest that the challenge could be based on interference with Section 7 rights, since the position of the memo is that individual class-action waivers do not implicate Section 7. But even assuming that a waiver-validity challenge would have a more than negligible chance of success, the addition of language assuring employees of their right to mount such a challenge, as GC Memo 10-06 requires, would not erase the tendency of the required waiver itself to interfere with the exercise of Section 7 rights. Employees still would reasonably believe that they were barred from filing or joining class or collective action,[17] as the arbitration agreement would still expressly state that they waive the right to do so. Employees reasonably would find an assurance that they may do so anyway either confusing or empty, or both: confusing, because employees would be told they have the right to do the very thing they waive the right to do; empty, because mandatory arbitration policies, such as Respondent's, are formal legal documents evidently prepared by, or with the aid of, counsel, and employees reasonably would assume that their employer would not go to the trouble

and expense of drafting and requiring that they execute a legally invalid waiver.

Finally, GC Memo 10–06 recognizes, as it must under *Eastex,* that Section 8(a)(1) would be violated if an employer threatens to retaliate against an employee for filing a class or collective action. It fails to recognize, however, that this basic principle is fundamentally at odds with the memo's ultimate conclusion. When, as here, employers require employees to execute a waiver as a condition of employment, there is an implicit threat that if they refuse to do so, they will be fired or not hired. Moreover, as stated above, the applicable test is that set forth in *Lutheran Heritage Village,* and under that test, a policy such as Respondent's violates Section 8(a)(1) because it expressly restricts Section 7 activity or, alternatively, because employees would reasonably read it as restricting such activity. That no employees are expressly threatened, disciplined, or discharged does not immunize the employer under existing precedent. We therefore reject the reasoning in GC Memo 10–06.

*B. There Is No Conflict between the NLRA and the FAA Under the Circumstances Presented Here*

Our analysis does not end, however, with the conclusion that the MAA restricts the exercise of rights protected by Federal labor law. The principal argument made by the Respondent and supporting amici is that finding the restriction on class or collective actions unlawful under the NLRA would conflict with the Federal Arbitration Act (FAA). The Respondent and amici contend that the Board has a duty to accommodate the FAA, and that dismissal of the 8(a)(1) allegation is therefore necessary.

---

[17] See *Bill's Electric,* 350 NLRB 292, 296 (2007) (finding mandatory arbitration policy unlawful under Sec. 8(a)(1) where it reasonably would be read "as substantially restricting" the filing of charges with the Board).

This is an issue of first impression for the Board.[18]  In dismissing the allegation that the class-action waiver was unlawful, the judge cited Supreme Court decisions that he characterized as "reflect[ing] a strong sentiment favoring arbitration as a means of dispute resolution," and circuit court decisions more specifically supporting the use of arbitration to resolve employment disputes.  He also observed that there is no Board precedent "holding that an arbitration clause cannot lawfully prevent class action lawsuits or joinder of arbitration claims."  None of the decisions cited by the judge, however, involved assertions that an arbitration clause interfered with NLRA rights.

The Board is responsible for administering the NLRA and enforcing the rights that the Act confers.  But in doing so, the Board must be and is mindful of any conflicts between the terms or policies of the Act and those of other federal statutes, including the FAA.  Where a possible conflict exists, the Board is required, when possible, to undertake a "careful accommodation" of the two statutes.  *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 47 (1942).  That does not mean, of course, that the Act must automatically yield to the FAA—or the other way around.  Instead, when two federal statutes "are capable of co-existence," both should be given effect "absent a clearly expressed congressional intention to the contrary."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

Thus, when circumstances arise that present a conflict between the underlying purposes of the Act and those of another federal statute, the Board has recognized that the issue must be resolved in a way that accommodates the policies underlying both statutes to the greatest extent possible.  *Direct Press Modern Litho*, 328 NLRB 860, 861 (1999); *Image Systems*, 285 NLRB 370, 371 (1987).[19]  For the reasons that follow, we conclude that finding the MAA unlawful, consistent with the well-established interpretation of the NLRA and with core principles of Federal labor policy, does not conflict with the letter or interfere with the policies underlying the FAA and, even if it did, that the finding represents an appropriate accommodation of the policies underlying the two statutes.

### 1. The FAA

The FAA was originally enacted in 1925.  Its general intent was to "reverse the longstanding judicial hostility to arbitration agreements" and to place private arbitration agreements "upon the same footing as other contracts."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  The FAA manifests "a liberal federal policy favoring arbitration agreements."  *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  It further requires that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  Id.  The FAA's primary substantive provision, Section 2, states in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal,

---

[18]  Various amici supporting the Respondent cite two decisions in which Federal district courts have been presented with the issue and have ruled that a class-action waiver does not violate the NLRA.  *Slawienski v. Nephron Pharmaceutical Corp.*, No. 1:10-CV-0460-JEC, 2010 WL 5186622 (N.D. Ga. Dec. 9, 2010), and *Webster v. Perales*, No. 3:07-CV-00919-M, 2008 WL 282305 (N.D. Tex. Feb. 1, 2008).  Although the results in those cases favor the Respondent, the courts' reasoning does not.

In *Slawienski*, the district court simply wrote protected concerted activity other than union activity out of Sec. 7 altogether:  "There is no legal authority," the court said, "to support plaintiff's position [that the arbitration agreement violates Sec. 8(a)(1)].  The relevant provisions of the NLRA . . . deal solely with an employee's right to participate in union organizing activities."  In support of that claim, the court quoted Sec. 7 but omitted the provision that protects "concerted activities for the purpose of . . . other mutual aid or protection."  The court then missed the point of the plaintiff's argument, saying that Sec. 7 rights were not implicated because plaintiff and those who would "opt in" to the collective action were pursuing FLSA claims, not claims under the NLRA.  *Slawienski*, supra slip op. at *2.

In *Webster*, the employer required plaintiffs to sign an arbitration agreement as a condition, not of employment, but of enrolling in an injury benefit plan.  The district court found that the class-action waiver was not unlawful under Sec. 8(a)(1) because (a) plaintiffs "expressly acknowledged that their agreement to arbitrate was made voluntarily and without duress, pressure, or coercion," and (b) the employer did not "threaten[ ] to terminate" employees who refused to sign the arbitration agreement.  *Webster*, supra slip op. at *4.  Whether or not *Webster* was correctly decided, here, in contrast to that case, signing the MAA was a condition of employment.

[19]  The Respondent, citing *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), contends that whenever the Board's choice of remedies has conflicted with another federal statute or policy, the Board has been required to yield.  The Respondent quotes the *Hoffman* Court's statement that it had "never deferred to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA."  535 U.S. at 144.  We do not understand the Court's statement to suggest that the Board's exercise of remedial discretion under the NLRA must always yield to the policies underlying other federal statutes no matter how important the chosen remedy is to vindication of rights protected by the NLRA.  Such a result obviously would violate the principle that the Federal "courts are not at liberty to pick and choose among congressional enactments."  *Morton*, supra 417 U.S. at 551.  Moreover, our holding here is that the MAA violates the substantive terms of the NLRA; it does not rest on an exercise of remedial discretion.  Finally, our holding here does not require the FAA to yield to the NLRA, but represents an accommodation of the two statutes.  In short, nothing in *Hoffman* precludes this result.

shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.[20]  The FAA permits the enforcement of private arbitration agreements, but those agreements remain subject to the same defenses against enforcement to which other contracts are subject.

An agreement falling within the terms of the FAA may provide for arbitration of federal statutory claims. See *Gilmer*, supra. The Supreme Court has repeatedly emphasized, however, that the FAA protects the right of parties to agree to resolve statutory claims in an arbitral forum so long as "a party does not forgo the substantive rights afforded by the statute." *Gilmer*, supra at 26 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985)). Thus, arbitration may substitute for a judicial forum only so long as the litigant can effectively vindicate his or her statutory rights through arbitration. *Gilmer*, supra at 28 (quoting *Mitsubishi*, supra at 637).

2. Holding that the MAA violates the NLRA does not conflict with the FAA or undermine the policy underlying the FAA

Holding that the MAA violates the NLRA does not conflict with the FAA or undermine the pro-arbitration policy underlying the FAA under the circumstances of this case for several reasons. First, the purpose of the FAA was to prevent courts from treating arbitration agreements less favorably than other private contracts. The Supreme Court, as explained, has made clear that "[w]herever private contracts conflict with [the] functions" of the National Labor Relations Act, "they obviously must yield or the Act would be reduced to a futility." *J. I. Case Co*, supra 321 U.S. at 337. To find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law. The MAA would equally violate the NLRA if it said nothing about arbitration, but merely required employees, as a condition of employ-

ment, to agree to pursue any claims in court against the Respondent solely on an individual basis. It is thus clear that our holding, that the MAA conflicts with the NLRA, does not rest on "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740, 1746 (2011).

Second, the Supreme Court's jurisprudence under the FAA, permitting enforcement of agreements to arbitrate federal statutory claims, including employment claims, makes clear that the agreement may not require a party to "forgo the substantive rights afforded by the statute." *Gilmer*, supra at 26. The question presented in this case is *not* whether employees can effectively vindicate their statutory rights under the Fair Labor Standards Act in an arbitral forum. See *Gilmer*, supra.[21] Rather, the issue here is whether the MAA's categorical prohibition of joint, class, or collective federal state or employment law claims in any forum directly violates the substantive rights vested in employees by Section 7 of the NLRA.

*Gilmer* addresses neither Section 7 nor the validity of a class action waiver. The claim in *Gilmer* was an individual one, not a class or collective claim, and the arbitration agreement contained no language specifically

---

[20]  Sec. 1 of the statute exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. That exemption – which is not at issue in this case – has been construed by the Supreme Court, based on the statutory language, to cover only "contracts of employment of transportation workers." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). The "legislative record on the § 1 exemption is quite sparse." Id. at 119. It seems fair to say, if immaterial to the Court's construction of the FAA, that the legislative history contains no discussion evincing a congressional intent to bring employment contracts of any sort under the statute. See id. at 119–121; see also id. at 125–128 (dissent of Justice Stevens, arguing that legislative history demonstrates congressional intent, in response to concerns of organized labor, to exclude all employment contracts from FAA).

[21]  In *Gilmer*, the Supreme Court held that a claim under the Age Discrimination in Employment Act (ADEA) could be subjected to compulsory arbitration pursuant to an agreement in a securities registration application.

The plaintiff, employed as a financial services manager, had registered as a securities representative with several stock exchanges, and the registration application provided for arbitration in accordance with the rules of the various exchanges. After being discharged by his employer, the plaintiff brought an action in Federal court alleging that his termination violated the ADEA.

The Court noted that not all statutory claims will be appropriate for arbitration, but that, "having made the agreement to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." 500 U.S. at 26 (quoting *Mitsubishi Motors*, 473 U.S. at 628). The Court stated that such intent, if it exists, must be shown by the party seeking to avoid arbitration, and will be found "in the text of the ADEA, its legislative history, or an 'inherent conflict' between arbitration and the ADEA's underlying purposes." Id. (quoting *Shearson/American Express v. McMahon*, 482 U.S. 220, 227 (1987)).

The plaintiff in *Gilmer* conceded there was no contrary intent in the ADEA or its legislative history. The Court therefore focused on whether there was an "inherent conflict" and found none. The Court acknowledged the public policies underlying the ADEA, but found that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Id. at 28 (quoting *Mitsubishi*, supra at 637). The Court then found that arbitration would not undermine the EEOC's role in enforcing the ADEA, because, inter alia, an individual ADEA claimant can still file a charge with the EEOC, and the EEOC has independent authority to investigate even absent a charge. Id. at 28–29. The Court also rejected various challenges to the adequacy of arbitration generally, finding those arguments "out of step" with current policy. Id. at 30.

waiving class or collective claims.[22] Here, although the underlying claim the Charging Party sought to arbitrate was based on the FLSA (specifically, the Charging Party contends that the Respondent misclassified him and other superintendents as exempt from FLSA requirements), the right allegedly violated *by the MAA* is not the right to be paid the minimum wage or overtime under the FLSA, but the right to engage in collective action under the NLRA. Thus, the question presented in this case is not whether employees can effectively vindicate their rights under the FLSA in arbitration despite a prohibition against class or collective proceedings, but whether employees can be required, as a condition of employment, to enter into an agreement waiving their rights under the NLRA.[23]

Any contention that the Section 7 right to bring a class or collective action is merely "procedural" must fail. The right to engage in collective action—including collective *legal* action—is the core substantive right protected by the NLRA and is the foundation on which the Act and Federal labor policy rest. The Respondent and supporting amici argue that class-action waivers do not implicate substantive rights under Section 7 because the right of a litigant to employ the class action procedures of Federal Rule of Civil Procedure 23 (or in corresponding State rules) or the collective action procedures under

the FLSA (29 U.S.C. § 216(b)) "is a procedural right only, ancillary to the litigation of substantive claims." *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 332 (1980). There is no substantive Section 7 right to maintain a class or collective action, the Respondent and amici contend. To the extent they mean that there is no Section 7 right to class certification, they are surely correct.[24] Whether a class is certified depends on whether the requisites for certification under Rule 23 have been met. But that is not the issue in this case. The issue here is whether Respondent may lawfully condition employment on employees' waiving their right under the NLRA to take the collective action inherent in seeking class certification, whether or not they are ultimately successful under Rule 23. Rule 23 may be a procedural rule, but the Section 7 right to act concertedly by invoking Rule 23, Section 216(b), or other legal procedures is not.

The Respondent and amici also cite *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 129 S.Ct. 1456 (2009), in which the Supreme Court held that a union, in collective bargaining, may agree to an arbitration clause that waives employees' rights to bring an action in court alleging employment discrimination under Title VII and the ADEA. It is well settled, however, that a properly certified or recognized union may waive certain Section 7 rights of the employees it represents—for example, the right to strike—in exchange for concessions from the employer. See, e.g., *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280 (1956). The negotiation of such a waiver stems from an *exercise* of Section 7 rights: the collective-bargaining process. Thus, for purposes of examining whether a waiver of Section 7 rights is unlawful, an arbitration clause freely and collectively bargained between a union and an employer does not stand on the same footing as an employment policy, such as the MAA, imposed on individual employees by the employer as a condition of employment. Although the Court in *Penn Plaza* stated that it saw no "distinction between the status of arbitration agreements signed by an individual employee and those agreed to by a union representative,"

---

[22] The plaintiff did argue that enforcing his arbitration agreement was inconsistent with the ADEA because "arbitration procedures . . . do not provide for . . . class actions." *Gilmer*, 500 U.S. at 32. But the Court pointed out that the arbitration rules actually at issue in *Gilmer* "provide for collective proceedings." Id. The Court, in dicta, then stated, "the fact that the [ADEA] provides for the possibility of collective action does not mean that individual attempts at conciliation were intended to be barred." The Court's evaluation of the intention behind the ADEA is not relevant to the question of compelled waiver of NLRA rights at issue here.

[23] The court decisions holding that FLSA claims can be vindicated effectively in an arbitral forum are therefore inapposite. See, e.g., *Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294, 297-298 (5th Cir. 2004) (finding no evidence that Congress intended to preclude individual arbitration of FLSA claims); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503, 506 (4th Cir. 2002) (same); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319–320 (9th Cir. 1996) (same). In any event, that issue remains unsettled. See, e.g., *Raniere v. Citigroup, Inc.*, 11 Civ 2448, 2011 WL 5881926, at *12-17 (S.D.N.Y. Nov. 22, 2011) (right to proceed collectively under FLSA cannot be waived); *Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547 (S.D.N.Y. 2011) (finding class-action waiver provision unenforceable where prohibitive cost of pursuing FLSA claim on an individual basis precluded plaintiff from effectively vindicating her statutory rights). We note that the Secretary of Labor and the EEOC, in an amicus brief filed with the Board, argue that at least in some cases, FLSA rights *cannot* be properly vindicated absent the ability to proceed collectively. If it were necessary to decide that issue here, there might be reason to defer to the judgment of those agencies, see, e.g., *Kingston Constructors*, 332 NLRB 1492, 1500–1501 & fn. 57 (2000), which are responsible for administering and enforcing the FLSA, but our holding rests on an entirely separate ground.

[24] Nothing in our holding guarantees class certification, it guarantees only employees' opportunity to pursue without employer coercion, restraint or interference such claims of a class or collective nature as may be available to them under Federal, State or local law. Employees who seek class certification in Federal court will still be required to prove that the requirements for certification under Rule 23 are met, and their employer remains free to assert any and all arguments against certification (other than the MAA). Further, if an employee seeks class certification and fails—in other words, if the court determines that the claim fails to meet the requirements of Rule 23 and therefore must be pursued individually rather than as a class action—the resulting action would be subject to dismissal under the MAA in favor of arbitration.

see 556 U.S. at ___, 129 S.Ct. at 1465, the Court was addressing a different question: whether the agreement, to which only the union was party, improperly waived employees' *individual* rights under Title VII and the ADEA, not their right to engage in concerted activity under the NLRA. Furthermore, the Court emphasized that the decision to arbitrate Title VII and ADEA claims does not amount to a decision to forgo those statutes' substantive guarantees against workplace discrimination. Id. at 1464 fn. 5. That statement highlights the material distinction between the present case, on the one hand, and, on the other, *Penn Plaza* and other cases applying *Gilmer's* analytical framework: here, a requirement that employees' work-related claims be resolved through arbitration on an individual basis only *does* amount to a requirement that employees forgo the NLRA's substantive protections.

Accordingly, finding the MAA's class-action waiver unlawful does not conflict with the FAA, because the waiver interferes with substantive statutory rights under the NLRA, and the intent of the FAA was to leave substantive rights undisturbed. Stated another way, under *Gilmer*, there is an inherent conflict between the NLRA and the MAA's waiver of the right to proceed collectively in any forum.

Third, nothing in the text of the FAA suggests that an arbitration agreement that is inconsistent with the NLRA is nevertheless enforceable. To the contrary, Section 2 of the FAA, quoted above, provides that arbitration agreements may be invalidated in whole or in part upon any "grounds as exist at law or in equity for the revocation of any contract." This clause is fully consistent with the FAA's general intent to place arbitration agreements on the same footing as other contracts. Entirely apart from the Supreme Court's teachings in *National Licorice* and *J. I. Case*, supra—cases invalidating private agreements that restricted NLRA rights—it is a defense to contract enforcement that a term of the contract is against public policy. See, e.g., *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). In fact, this principle has been specifically followed in relation to contract provisions violating the NLRA.

> It is . . . well established . . . that a federal court has a duty to determine whether a contract violates federal law before enforcing it. "The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in . . . federal statutes. . . . Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from

such exertions of judicial power." *Hurd* v. *Hodge*, 334 U.S. 24, 34-35 (1948) (footnotes omitted).

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83–84 (1982).

Courts presented with such a defense apply a balancing test: where the interest in favor of enforcing a contract term is outweighed by a public policy against enforcement, the term is unenforceable. Restatement (2d) of Contracts §178(1). In assessing the weight to be given to the respective interests, one must consider "the strength of the public policy as manifested by legislation" and "the likelihood that a refusal to enforce the term will further that policy." Id. § 178(3). As explained above, Section 7 of the NLRA manifests a strong federal policy protecting employees' right to engage in protected concerted action, including collective pursuit of litigation or arbitration. Moreover, Section 8(a)(1) and other provisions of the NLRA derived from the earlier Norris-LaGuardia Act manifest a strong federal policy against agreements in the nature of yellow-dog contracts, in which individual employees are required, as a condition of employment, to cede their right to engage in such collective action. A refusal to enforce the MAA's class-action waiver would directly further these core policies underlying the NLRA.

A policy associated with the FAA and arguably in tension with the policies of the NLRA was explained by the Supreme Court in *AT&T Mobility v. Concepcion*, supra at 1748: The "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." The "switch from bilateral to class arbitration," the Court stated, "sacrifices the principal advantage of arbitration—its informality." Id. at 1750. But the weight of this countervailing consideration was considerably greater in the context of *AT&T Mobility* than it is here for several reasons. *AT&T Mobility* involved the claim that a class-action waiver in an arbitration clause of any contract of adhesion in the State of California was unconscionable. Here, in contrast, only agreements between employers and their own employees are at stake. As the Court pointed out in *AT&T Mobility*, such contracts of adhesion in the retail and services industries might cover "tens of thousands of potential claimants." Id. at 1752. The average number of employees employed by a single employer, in contrast, is 20,[25] and most class-wide em-

---

[25]   The U.S. Census Bureau reports that in 2008 there were 5,930,132 employers (with employees), and those employers employed 120,903,551 employees. See http://www.census.gov/econ/smallbus.html. Accord: See U.S. Census Bureau, Sector 00: Survey of Business Owners (SBO): Company Statistics Series: Statistics for All U.S. Firms by Geographic Area, Industry, Gender, Ethnicity, and Race: 2007, available at

ployment litigation, like the case at issue here, involves only a specific subset of an employer's employees. A class-wide arbitration is thus far less cumbersome and more akin to an individual arbitration proceeding along each of the dimensions considered by the Court in *AT&T Mobility*—speed, cost, informality, and risk—when the class is so limited in size. 131 S.Ct. at 1751–1752. Moreover, the holding in this case covers only one type of contract, that between an employer and its covered employees, in contrast to the broad rule adopted by the California Supreme Court at issue in *AT&T Mobility*. Accordingly, any intrusion on the policies underlying the FAA is similarly limited.

Thus, whether we consider the policies underlying the two statutes as part of the balancing test required to determine if a term of a contract is against public policy and thus properly considered invalid under Section 2 of the FAA, or as part of the accommodation analysis required by *Southern Steamship, Morton*, and other Supreme Court precedent, our conclusion is the same: holding that an employer violates the NLRA by requiring employees, as a condition of employment, to waive their right to pursue collective legal redress in both judicial and arbitral forums accommodates the policies underlying both the NLRA and the FAA to the greatest extent possible.

Finally, even if there were a direct conflict between the NLRA and the FAA, there are strong indications that the FAA would have to yield under the terms of the Norris-LaGuardia Act. As explained above, under the Norris-LaGuardia Act, a private agreement that seeks to prohibit a "lawful means [of] aiding any person participating or interested in" a lawsuit arising out of a labor dispute (as broadly defined) is unenforceable, as contrary to the public policy protecting employees' "concerted activities for . . . mutual aid or protection." To the extent that the FAA requires giving effect to such an agreement, it would conflict with the Norris-LaGuardia Act. The Norris-LaGuardia Act, in turn—passed 7 years *after* the FAA,—repealed "[a]ll acts and parts of act in conflict" with the later statute (Section 15).[26]

---

http://factfinder.census.gov/servlet/IBQTable?_bm=y&-geo_id=D&-ds_name=SB0700CSA01&-_lang=en   Employers covered by the Act may, on average, employ slightly more employees because only employers engaged in interstate commerce are covered, but that exclusion may be balanced by the exclusion of employers covered by the Railway Labor Act, which on average employ more employees than those covered by the NLRA.

[26] In addition, the Supreme Court has held that when two federal statutes conflict, the later enacted statute, here the NLRA, must be understood to have impliedly repealed inconsistent provisions in the earlier enacted statute. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976); *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 582 fn. 18 (1971); *Posadas v. Nat'l City Bank*, 296 U.S.

## C. The Supreme Court's Restriction on Compelling Class Arbitration Is Not Implicated Here

The Respondent and some amici further argue that holding that the MAA violates the NLRA would be inconsistent with two recent Supreme Court decisions stating that a party cannot be required, without his consent, to submit to arbitration on a classwide basis. See *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758, 1775–1776 (2010) (arbitration panel exceeded its authority by permitting class antitrust claim when commercial shipping charter agreement's arbitration clause was silent on class arbitration); *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740, 1751–1753 (2011) (claim that class-action waiver in consumer arbitration agreement was unconscionable under state law was preempted by FAA). Neither case is controlling here. Neither involved the waiver of rights protected by the NLRA or even employment agreements. Furthermore, *AT&T Mobility* involved a conflict between the FAA and state law, which is governed by the Supremacy Clause, whereas the present case involves the argument that two federal statutes conflict. Finally, nothing in our holding here requires the Respondent or any other employer to permit, participate in, or be bound by a class-wide or collective arbitration proceeding.

We need not and do not mandate class arbitration in order to protect employees' rights under the NLRA. Rather, we hold only that employers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in *all* forums, arbitral and judicial. So long as the employer leaves open a judicial forum for class and collective claims, employees' NLRA rights are preserved without requiring the availability of classwide arbitration. Employers remain free to insist that *arbitral* proceedings be conducted on an individual basis.

### III.

We emphasize the limits of our holding and its basis. Only a small percentage of arbitration agreements are potentially implicated by the holding in this case. First, only agreements applicable to "employees" as defined in the NLRA even potentially implicate Section 7 rights.[27]

---

497, 503 (1936); see also *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948 (11th Cir. 2001); Sutherland Stat Const § 51.02 (5th ed.) ("Where two statutes are involved each of which by its terms applies to the facts before the court, the statute which is the more recent of the two irreconcilably conflicting statutes prevails.").

[27] Sec. 2(3) of the Act provides that the term "employee" excludes
any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervi-

Second, the employment-related contracts of those transportation workers covered by the Act (e.g., interstate truck drivers) appear already to be exempted from the FAA, by section 1 of that statute. See fn. 20, supra. Finally, only those agreements that would be reasonably read to bar protected, concerted activity are vulnerable. For example, an agreement requiring arbitration of any individual employment-related claims, but not precluding a judicial forum for class or collective claims, would not violate the NLRA, because it would not bar concerted activity. Thus, contrary to the suggestion of the Respondent and supporting amici, finding the MAA's class-action waiver unlawful will not result in any large-scale or sweeping invalidation of arbitration agreements.[28]

Nor does our holding rest on any form of hostility or suspicion of arbitration. Indeed, arbitration has become a central pillar of Federal labor relations policy and in many different contexts the Board defers to the arbitration process both before and after the arbitrator issues an award. See *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578 (1960) ("The present federal policy is to promote industrial stabilization through the collective bargaining agreement. . . . A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement."); *Collyer Insulated Wire,* 291 NLRB 837, 839–843 (1971) (pre-award deferral); *Spielberg Mfg. Co.,* 112 NLRB 1080, 1081 (1955) (post-award deferral). Rather, our holding rests not on any conflict between an agreement to arbitrate and the NLRA, but rather solely on the conflict between the compelled waiver of the right to act collectively in any forum, judicial or arbitral, in an effort to vindicate workplace rights and the NLRA.

We thus hold, for the reasons explained above, that the Respondent violated Section 8(a)(1) by requiring em-

---

sor, or any individual employed by an employer subject to the Railway Labor Act . . . or by any other person who is not an employer as herein defined.

Sec. 2(2) of the Act, in turn, defines "employer" to exclude, inter alia, employees of the federal government or any state or political subdivision. Thus, significant numbers of workers typically considered to be "employees" in lay terms—supervisors, government employees, and independent contractors being perhaps the largest groups—are not covered by Sec. 7, and therefore any class or collective action waiver to which they are subject cannot be challenged on Sec. 7 grounds.

[28] Moreover, we do not reach the more difficult questions of (1) whether an employer can require employees, as a condition of employment, to waive their right to pursue class or collective action in court so long as the employees retain the right to pursue class claims in arbitration and (2) whether, if arbitration is a mutually beneficial means of dispute resolution, an employer can enter into an agreement that is not a condition of employment with an individual employee to resolve either a particular dispute or all potential employment disputes through non-class arbitration rather than litigation in court.

ployees to waive their right to collectively pursue employment-related claims in all forums, arbitral and judicial.

AMENDED CONCLUSIONS OF LAW

Substitute the following for the judge's Conclusion of Law 2.

"2. By maintaining a mandatory arbitration agreement provision that waives the right to maintain class or collective actions in all forums, whether arbitral or judicial, and that employees reasonably could believe bars or restricts their right to file charges with the National Labor Relations Board, the Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act and has violated Section 8(a)(1) of the Act."

AMENDED REMEDY

Because the Respondent utilized the MAA on a corporate-wide basis, we shall order, in addition to the relief ordered by the administrative law judge, that the Respondent post a notice at all locations where the MAA was in effect. See, e.g., *U-Haul Co. of California,* 347 NLRB 375 fn. 2 (2006), enfd. 255 Fed. Appx. 527 (D.C. Cir. 2007).

ORDER

The National Labor Relations Board orders that the Respondent, D. R. Horton, Inc., Deerfield Beach, FL, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees reasonably could believe bars or restricts their right to file charges with the National Labor Relations Board.

(b) Maintaining a mandatory arbitration agreement that waives the right to maintain class or collective actions in all forums, whether arbitral or judicial.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind or revise the Mutual Arbitration Agreement to make it clear to employees that the agreement does not constitute a waiver in all forums of their right to maintain employment-related class or collective actions and does not restrict employees' right to file charges with the National Labor Relations Board.

(b) Notify the employees of the rescinded or revised agreement to include providing them a copy of the revised agreement or specific notification that the agreement has been rescinded.

14                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(c) Within 14 days after service by the Region, post at its facility at Deerfield Beach, Florida, and any other facility where the Mandatory Arbitration Agreement has been in effect, copies of the attached notice marked "Appendix."[29] Copies of the notice, on forms provided by the Regional Director for Region 12 after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since August 3, 2010.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 12 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. January 3, 2012

_____
Mark Gaston Pearce,            Chairman

_____
Craig Becker,                  Member

(SEAL)         NATIONAL LABOR RELATIONS BOARD
                        APPENDIX
                 NOTICE TO EMPLOYEES
               POSTED BY ORDER OF THE
             NATIONAL LABOR RELATIONS BOARD
        AN AGENCY OF THE UNITED STATES GOVERNMENT

_____
[29] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that waives the right to maintain class or collective actions in all forums, whether arbitral or judicial.

WE WILL NOT maintain a mandatory arbitration agreement that employees reasonably could believe bars or restricts their right to file charges with the National Labor Relations Board.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Federal labor law.

WE WILL rescind or revise the Mutual Arbitration Agreement to make it clear to employees that the agreement does not constitute a waiver of their right in all forums to maintain class or collective actions and does not restrict employees' right to file charges with the National Labor Relations Board.

WE WILL notify employees of the rescinded or revised agreement, including providing them with a copy of the revised agreement or specific notification that the agreement has been rescinded.

D. R. HORTON, INC.

John F. King, Esq., or the General Counsel.
Mark Stubley, Esq. & Bernard P. Jeweler, Esq., (Ogletree Deakins), for the Respondent.

DECISION

STATEMENT OF THE CASE

WILLIAM N. CATES, Administrative Law Judge. This matter arises out of a consolidated complaint and notice of hearing issued on November 26, 2008, against D.R. Horton, Inc. (the Respondent), stemming from unfair labor practice (ULP) charges filed by Michael Cuda, an individual. The complaint, as amended, alleges that the Respondent violated Section 8(a)(1) and (4) of the National Labor Relations Act (the Act) by maintaining and enforcing individual arbitration agreements that employees have been required to execute as a condition of employment.[1]

_____
[1] On April 20, 2009, the Regional Director issued an order severing cases, approving withdrawal of certain allegations of complaint, and approving withdrawal of charge in Case 12–CA–25766. As a result,

Pursuant to notice, I conducted a trial in Miami, Florida, on November 8, 2010, at which I afforded the parties full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence.

### Issues

1) Has the Respondent violated Section 8(a)(1) by maintaining and enforcing a mandatory arbitration agreement with its employees that unlawfully prohibits them from engaging in protected concerted activities, including joint arbitration claims or class action lawsuits?

2) Do such agreements lead employees reasonably to believe that they are barred or restricted from filing charges with the NLRB, thereby violating Section 8(a)(4) and (1)?

### Facts

Based on the entire record, including testimony, documents, and stipulations, as well as the thoughtful post trial briefs filed by the General Counsel and the Respondent, I find the following.

The salient facts are undisputed.  The Respondent, a Delaware corporation with an office and place of business located in Deerfield Beach, Florida (the facility), is engaged in the business of building and selling homes. The Respondent has admitted Board jurisdiction as alleged in the complaint, and I so find.

In January 2006, Respondent, on a corporate-wide basis, implemented a policy of requiring each current and new employee to sign a mutual arbitration agreement as a condition of employment.[2]  The agreement provides, inter alia, that all employment disputes and claims shall be determined exclusively by final and binding arbitration before a single, neutral arbitrator.  Specifically included are claims for discrimination or harassment; wages, benefits, or other compensation; breach of contract; violations of public policy; personal injury; and tort claims.  In reference to employees' statutory rights, the only express exclusions are employee claims for workers' compensation or unemployment benefits.

Paragraph six of the agreement states:

[T]he arbitrator will not have the authority to consolidate the claims of other employees into a proceeding originally filed by either the Company or the Employee.  The arbitrator may hear only Employee's individual claims and does not have the authority to fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding.

At around the time of the distribution of the arbitration agreement to employees, the Respondent provided facility supervisors with a list of employees' frequently asked questions and the appropriate responses.[3]  One of the instructions was to tell employees who expressed concern about the scope of the agreement that the agreement applied to relief sought through the courts and that they would still be able to go to the EEOC

or similar agency with a complaint.  However, the Respondent did not provide these questions and answers to employees at the time, and there is no evidence it ever communicated to them the above clarification of the scope of the agreement to its employees.

By letter dated February 13, 2008,[4] Cuda's attorney, Richard Celler, notified the Respondent that his law firm had been retained to represent Cuda and a class of similarly situated current and former "Superintendents" the Respondent employed on a national basis, to contest the Respondent's "misclassification" of them as exempt employees under the Fair Labor Standards Act.[5]  The letter went on to state it constituted formal notice of a request to commence the arbitration process under paragraph 3 of the arbitration agreement.  By letter of the same date, Celler advised Respondent his firm was also representing five other named employees.[6]  By letter of February 21, Celler notified Respondent he was similarly representing employee Mario Cabrera and a class of similarly situated current and former "Superintendents" Respondent employed on a national basis.[7]

By letter of March 14, Michael Tricarloo, Respondent's counsel, replied to Celler's February 13 letter concerning the five-named employees.[8]  Citing the language in paragraph 6 barring arbitration of collective claims, he denied the February 13 letter constituted effective notice of intent to initiate arbitration.  For the same reason, Ticarloo, by letter of March 20, denied the validity of Cabrera's notice of intent.[9]

### Analysis and Conclusions

Preliminarily, in reaching my conclusions about the legality of the provisions in question, I do not rely on the Region's initial determination or the contrary result of the General Counsel's Office of Appeals.[10]  Further, I will not consider as dispositive Memorandum GC-10-06, cited in the Respondent's brief (at 5).  The Board has repeatedly held that policies set out in the General Counsel's Casehandling Manual are not binding on the Board (or the General Counsel, for that matter).  *Hempstead Lincoln Mercury Motors Corp.*, 349 NLRB 552, 553 fn. 4 (2007); see also *Children's National Medical Center*, 322 NLRB 205, 205 fn. 1 (1996).  The same logic applies to other internal pronouncements the General Counsel issues.

I. DOES THE MANDATORY ARBITRATION AGREEMENT VIOLATE SECTION 8(a)(1) BY UNLAWFULLY PROHIBITING EMPLOYEES FROM ENGAGING IN PROTECTED CONCERTED ACTIVITIES?

Section 7 of the Act, as amended, 29 U.S.C. § 157, provides in relevant part that employees have the right to engage in concerted activities for their "mutual aid or protection."  The Supreme Court has held that this "mutual aid or protection" clause encompasses employees acting together to better their working

---

co-respondent DHI Mortgage Co. LTD, a subsidiary of the Respondent, was removed from the complaint.  Accordingly, I will not address evidence that pertained to it as distinct from the Respondent per se.

[2] Jt. Exh. 2.
[3] E. Exh. 1.

[4] All dates hereinafter occurred in 2008 unless otherwise stated.
[5] Jt. Exh. 4.
[6] Jt. Exh. 5.
[7] Jt. Exh. 6.
[8] Jt. Exh. 8.
[9] Jt. Exh. 10.
[10] See E. Exhs. 3 & 2, respectively.

16                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

conditions through resort to administrative and judicial forums. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–567 (1978). In *Rockwell International Corp. v. NLRB*, 814 F.2d 1530, 1536 (11th Cir. 1987), the Circuit Court cited *Eastex* for the proposition that Section 7 is liberally construed to protect a broad range of employees concerns. Filing a class action lawsuit constitutes protected activity unless done with malice or in bad faith. *Harco Trucking, LLC*, 344 NLRB 478 (2005); *U Ocean Palace Pavilion, Inc.*, 345 NLRB 1162 (2005).

The crux of the matter here is the efficacy of a mandatory arbitration provision that restricts employees' from joining arbitration claims or collectively recourse outside of arbitration. The General Counsel does not contend arbitration agreements are per se unlawful (GC br. at 12).

Indeed, decisions of the Supreme Court in recent years reflect a strong sentiment favoring arbitration as a means of dispute resolution. A leading case in the employment area is *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991). Therein, the Court held an Age Discrimination in Employment Act (ADEA) claim can be subject to compulsory arbitration. The Court reviewed the Federal Arbitration Act (FAA), originally enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code, concluding its provisions manifest a "'liberal federal policy favoring arbitration agreements.' *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)." Id. at 25 (footnote omitted).

The Court went on to state (Id. at 26) (citations omitted):

> Although all statutory claims may not be appropriate for arbitration, '[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." . . . [T]he burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims . . . . "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."

The Court noted an individual ADEA claimant subject to an arbitration agreement was still free to file a charge with the Equal Employment Opportunity Commission, even though barred from instituting private judicial action. In *14 Penn Plaza LLC v. Pyett*, 129 S. Ct. 1456, 1465 (2009), the Court held the *Gilmer* Court's interpretation of the ADEA fully applied in the collective-bargaining context so that a provision in a collective-bargaining agreement requiring union members to arbitrate ADEA claims was enforceable as a matter of federal law.

The Eleventh Circuit Court of Appeals has also expressed judicial support for the use of arbitration in the employment arena. See *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) ("[C]ompulsory arbitration agreements are now common in the workplace, and it is not an unlawful employment practice for an employer to require an employee to arbitrate, rather than litigate, rights under various federal stat-

ues, including employment-discrimination statutes"); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1313 (11th Cir. 2002) ("[A]rbitration agreements encompassing claims brought under federal employment discrimination statutes have also received near universal approval").

I am not aware of any Board decision holding that an arbitration clause cannot lawfully prevent class action lawsuits or joinder of arbitration claims. On the other hand, in *Stolt-Nielsen S.A. v. Animal Feeds*, 130 S. Ct. 1758, 1773–1775 (2010), the Supreme Court emphasized the consensual nature of private dispute resolution and held "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so" (emphasis in original).

In light of the above pronouncements of the Supreme Court and the Eleventh Circuit Court of Appeals, and the absence it appears of direct Board precedent, I decline to conclude that the provision in question violates Section 8(a)(1) by unlawfully prohibiting employees from engaging in protected concerted activities.

### DOES THE MANDATORY ARBITRATION AGREEMENT VIOLATE SECTION 8(a)(4) AND (1) BY LEADING EMPLOYEES REASONABLY TO BELIEVE THEY CANNOT FILE CHARGES WITH THE NLRB?

In at least two cases, the Board has dealt with the issue of mandatory arbitration policies in unorganized workforces. In *U-Haul Co. of California*, 347 NLRB 375 (2006), enforcement granted, 255 Fed.Appx. 527 (D.C. Cir. 2007), rehearing en banc denied (2008), the Board addressed a mandatory arbitration policy that enumerated various types of disputes and claims and included "any other legal or equitable claims and causes of action recognized by local, state or federal law or regulations." The Board held this language unlawful under Section 8(a)(4) and (1) because employees reasonably could conclude they were precluded from filing NLRB charges. Id. at 377–378. The Board specifically rejected the respondent's argument the arbitration policy was not unlawful because the memo announcing it included the statement the "arbitration process is limited to disputes, claims or controversies that a court of law would be authorized to entertain or would have jurisdiction over to grant relief." As the Board explained (ibid):

> The reference to a "court of law" in this part of the memo does not by its terms specifically exclude an action governed by an administrative proceeding such as one conducted by the National Labor Relations Board. . . . Further, inasmuch as decisions of the National Labor Relations Board can be appealed to a United States court of appeals, the reference to a "court of law" does nothing to clarify that the arbitration policy does not extend to the filing of unfair labor practice charges. While . . . it is the NLRB, and not the individual, who presents the case to court, we believe that most nonlawyer employees would not be familiar with such intricacies of Federal court jurisdiction, and thus the language is insufficient to cure the defects in the policy.

Similarly, in *Bills Electric, Inc.*, 350 NLRB 292, 296

(2007), the Board found unlawful a mandatory arbitration provision providing that arbitration be "the exclusive method of resolution of all disputes," although it expressly stated that "this shall not be a waiver of any requirement for the Employee to timely file any charge with the NLRB, EEOC, or any State Agency." As the Board stated, after analyzing all of the factors present, "At the very least, the mandatory grievance and arbitration policy would reasonably be read by affected applicants and employees as substantially restricting, if not totally prohibiting, their access to the Board's processes." Ibid.

The ultimate test it appears, then, is determining whether nonlawyer employees would reasonably conclude they are barred or restricted from filing NLRB charges. Although the Respondent's instructions to its supervisors clarified the right of employees to access the Board's processes, such was never communicated to employees and therefore is of no operative effect. I conclude the language of the mandatory arbitration agreement, on its face, would lead employees reasonably to believe they could not file charges with the Board.

Even if I deemed the language to be ambiguous, it is well settled, as a general precept, ambiguous policies or rules that reasonably could be interpreted as violative of employee rights will be construed against the maker of the policy or rule and, even if not followed, will be found to violate the Act. *St. Francis Hotel*, 260 NLRB 1259, 1260 (1982); see also *Norris/O'Bannon*, 307 NLRB 1236, 1245 (1992).

Accordingly, I conclude Respondent's maintenance of the mandatory arbitration agreement violates Section 8(a)(4) and (1) of the Act.

CONCLUSION OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. By maintaining a mandatory arbitration provision that employees reasonably could believe bars or restricts their right to file charges with the National Labor Relations Board, the Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act and violates Section 8(a)(4) and (1) of the Act.

REMEDY

Because I have found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

ORDER

The Respondent, D.R. Horton, Inc., Deerfield Beach, Florida, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a mandatory arbitration agreement that employees reasonably could believe bars or restricts their right to file charges with the National Labor Relations Board.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind or revise the mutual arbitration agreement to make it clear to employees the agreement does not in any way bar or restrict their right to file charges with the National Labor Relations Board.

(b) Notify the employees of the rescinded or revised agreement to include providing them a copy of the revised agreement or specific notification that the agreement has been rescinded.

(c) Within 14 days after service by the Region, post at its facility at Deerfield Beach, Florida, copies of the attached notice marked "Appendix."[11] Copies of the notice, on forms provided by the Regional Director for Region 12 after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since August 3, 2010.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 12 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated Washington, D.C., January 3, 2011.

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain a mandatory arbitration agreement that you reasonably could believe bars or restricts your right to

---

[11] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

file charges with the National Labor Relations Board.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights that Federal law guarantees you.

WE WILL rescind or revise the mutual arbitration agreement to make it clear the agreement does not in any way bar or restrict your right to file charges with the National Labor Relations Board.

WE WILL provide to you copies of the revised agreement, or notify you in writing we have rescinded the agreement.

D. R. HORTON, INC.